**NATIONAL LABOR RELATIONS BOARD v. NATIONAL MOTOR BEARING CO.**

**INTERNATIONAL ASS'N OF MACHINISTS AND PRODUCTION WORKERS LOCAL 1518, v. NATIONAL LABOR RELATIONS BOARD.**

No. 8869.

Circuit Court of Appeals, Ninth Circuit.

June 2, 1939.

As Amended June 15, 1939.

Charles Fahy, Gen. Counsel, Robert B. Watts, Assoc. Gen. Counsel, and Laurence A. Knapp, A. Norman Somers, Ruth Weyand, and Robert S. Erdahl, Attys., National Labor Relations Board, all of Washington, D. C., and John T. McTernan, Atty., National Labor Relations Board, of San Francisco, Cal., for petitioner National Labor Relations Board.

Joseph A. Padway, of Washington, D. C., and I. B. Padway, of Milwaukee, Wis., for petitioner International Ass'n of Machinists and Production Workers Local 1518, Affiliated with International Ass'n of Machinists.

Charles S. Wheeler, Jr., of San Francisco, Cal., and J. Marcus Hardin, of Oakland, Cal., for respondent.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

This case comes before the Court upon petition by the National Labor Relations Board for the enforcement of an order issued by it against respondent, and upon petition by a labor union, alleged to be adversely affected by said order, to set the same aside. The proceedings have been consolidated for hearing and determination.

The International Association of Machinists, affiliated with the American Federation of Labor, hereinafter called the A. F. of L., will be called the I. A. M.; Production Workers Local 1518 will be called the Union; and International Union, United Automobile Workers of America, Local No. 76, affiliated with the Committee [now Congress] for Industrial Organization, will be called the U. A. W. The employer will be called the respondent.

Respondent is engaged in the manufacture, sale and distribution of shims and oil

HANEY, Circuit Judge, dissenting in part.

seals or retainers. It advertises on a nation-wide basis and sells shims in more than half of the States, and retainers in all. Much of the raw material entering into the products of respondent is procured from States other than California where respondent's factory is located. All of respondent's competitors are located outside of California.

The employees in the respondent's tool and die department have always been members of certain I. A. M. locals which are not involved in this proceeding. There had never been any kind of agreement between the I. A. M. and the respondent, but it had made it a practice to hire its tool and die workers from the I. A. M. and pay them the prevailing union wages.

Some time in August, 1936, about 17 of respondent's production employees attended a meeting of I. A. M. Local 284, and signed applications to join the same. These applications were rejected because Local 284 had been instructed by the I. A. M. that it could not admit to membership the production workers since they were not skilled machinists. A few days before February 21, 1937, the U. A. W. began organization. Prior to February 27, 1937, the U. A. W. and its supporters held two preliminary organizational meetings, distributed leaflets, and secured employee applications both at the plant and at the homes of the employees. Respondent knew of the U. A. W.'s efforts to organize its employees. A third U. A. W. meeting was set for February 28, 1937, but prior to that time on February 27, 1937 the respondent shut down its plant without warning to its employees. On the arrival of the employees at the plant for work on February 27, 1937, they found it closed and guarded by city police. All foremen were admitted save one, who was a member of the U. A. W.

On finding the plant closed, Frank Slaby, president of the U. A. W., gained admittance to the plant in order to see its manager, but was ejected by the police before meeting the manager.

On March 1, 1937 the U. A. W. submitted to respondent a form of contract containing a provision that the U. A. W. be recognized as the sole bargaining agent of the employees, and requested respondent to bargain with it. Respondent's manager was informed of the receipt of this contract by telephone on Monday morning, March 1, 1937, while at the office of his attorney. He did not at any time communicate with the U. A. W. or in any manner afford them an opportunity to substantiate their claims as sole bargaining agents of the employees. Instead, on the afternoon of March 1, 1937, he signed a contract with the I. A. M., whose officials had that day presented to respondent a letter which stated that a majority of the employees had been affiliated with the I. A. M., and requested a conference. The I. A. M. contract provided that the respondent was to re-open its plant, that the I. A. M. members were to return to work and that the pending negotiations were to continue, the results thereof to be retroactive to the time of resumption of full operations.

The U. A. W. had begun picketing on March 1, 1937. Respondent reopened its plant on March 8, 1937, and a large number of employees returned to work with a police escort. During the succeeding weeks, more employees returned, but the plant did not commence actual operations until March 15, 1937. Two weeks later the respondent began to hire new employees to take the place of those who had not returned.

On April 19, 1937, the respondent entered into a contract with the Union, providing for a closed shop, and wages, hours and other conditions of employment. The contract was for the period of a year, to be renewed from year to year unless terminated by either party by notice at least thirty days prior to the annual expiration date.

The U. A. W. filed its charge with the Board on March 4, 1937. On May 3, 1937, the Board issued its complaint alleging that respondent had engaged in and was engaging in unfair labor practices defined in § 8 (1), (3) and (5) of the act. For convenient reference we quote certain provisions of the act.

"Sec. 7 [29 U.S.C.A. § 157]. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.

"Sec. 8 [29 U.S.C.A. § 158]. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157]. * * *

"3. By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act [chapter] * * * shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act [chapter] as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9(a) [159 (a) of this title], in the appropriate collective bargaining unit covered by such agreement when made. * * *

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [159(a) of this title].

"Sec. 9 [29 U.S.C.A. § 159] (a). Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. * * *

"(b) The Board shall decide in each case whether, in order to insure the employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this Act [chapter], the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof. * * * * "

After making certain findings, which will be referred to below, in part, the Board concluded that the allegations of the complaint were proven with respect to unfair labor practices. It made an order on February 18, 1938, requiring respondent (1) to cease and desist from (a) interfering with, restraining or coercing its employees in the exercise of the rights guaranteed in § 7 of the Act; (b) maintaining surveillance of the meetings and activities of the U. A. W. or any other labor organization of its employees; (c)

discouraging membership in U. A. W. or encouraging membership in the Union or any other labor organization of its employees, by discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to their hire and tenure; (d) refusing to reinstate 56 listed employees or requiring as a condition to their reinstatement, membership in the Union; (e) giving effect to its contracts with the Union; (f) recognizing the Union as the exclusive representative of its employees; (g) refusing to bargain collectively with the U. A. W. as the exclusive representative of its production, maintenance, and shipping employees, exclusive of supervisory employees, foremen, regular clerical employees, and employees in the tool and die department, in respect of rates of pay, wages, hours and other conditions of employment. The order also required respondent (2) to take the following affirmative action: (a) offer the 56 employees reinstatement; (b) make such employees whole for loss of pay; (c) inform such employees that they are free to join the U. A. W.; (d) upon request, bargain collectively with U. A. W. as the exclusive representative of its production, maintenance, and shipping employees; (e) post notices that it would cease and desist as aforesaid, and that its employees were free to join or assist any labor organization.

Leaving for subsequent discussion provision 1 (a) of the order, we first consider provision 1 (b) thereof in the light of respondent's contentions.

Provision 1 (b) of the order commands respondent to cease and desist from "maintaining surveillance of the meetings and activities of International Union, United Automobile Workers of America, Local No. 76, or any other labor organization of its employees". The Board has found that on the occasion of the first organization meeting of the U. A. W., D. O. Johnston, secretary-treasurer of the respondent and its plant manager, drove past the U. A. W. headquarters in his car and, returning, parked in front of it, pencil and paper in hand; that on request of the president of the Local to give up the paper, upon which it was assumed he had been taking down names, he refused to do so; that upon the request of the president of the Local he left; that L. A. Johnston who controls the policy and activity of respondent, testified that he had requested

his brother not to make this visit since it might be "misconstrued" and that he later "criticized" him for so doing. Nothing further appears in the findings to form a basis for provision 1 (b) of the order. The Board did not find that the recited activity was a violation of any of the provisions of section 8 of the Act. Though surveillance may constitute an unfair labor practice (National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 270, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Freuhauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 630, 81 L.Ed. 918, 108 A.L.R. 1352; Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126) it is not such unless it interferes with, restrains or coerces respondent's employees in the exercise of the rights guaranteed in section 7 [section 8(1)], or dominates or interferes with a labor organization as prohibited by section 8(2). There being no finding to the effect that the activity of D. O. Johnston did any of these things and the Board's findings not requiring such an inference, we cannot enforce provision 1 (b) of the order on the record before us. In such situation we are empowered to remand to the Board for the purpose of supplying the essential finding (Ford Motor Co. v. N. L. R. B., 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221) but we are not required so to do. As said in the last cited case, 305 U.S. at page 373, 59 S.Ct. at page 307: "The jurisdiction to review the orders of the Labor Relations Board is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, *it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.* The purpose of the judicial review is consonant with that of the administrative proceeding itself,—*to secure a just result with a minimum of technical requirements.*" (Emphasis added.) And as said in Federal Trade Commission v. Curtis Co., 260 U. S. 568, 580, 43 S.Ct. 210, 213, 67 L.Ed. 408, where the Supreme Court was governed as to its judicial review by a statute similar to that controlling us: "If there be substantial evidence relating to such facts [facts not reported by the Commission] from which different conclusions reasonably may be drawn, the matter may be and ordinarily, we think, should be remanded to the commission—the primary fact-finding body—with direction to make additional findings, *but if from all the circumstances it clearly appears, that in the interest of justice the controversy should be decided without further delay, the court has full power under the statute so to do.*" (Emphasis added.)

▮ In the present case we believe that equitable principles require us without further delay to refuse to enforce provision 1 (b) of the order. In view of the fact (as will appear later) that the Board has elsewhere [provision 1 (a)] validly ordered in general terms the cessation of any activity interfering with the exercise by the employees of the rights guaranteed them by section 7, no great significance attaches to our refusal to command enforcement of provision 1 (b).

▮ Provision 1 (c) of the order requires respondent to cease and desist from encouraging and discouraging membership in any labor organization of its employees "by discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment". This order is based on the finding that: "The respondent, by shutting down its plant on February 27, 1937, and locking out its employees, discriminated against its employees with respect to hire and tenure of employment for the purpose of discouraging membership in the U. A. W., and that by such act, the respondent interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act." We think this finding is supported by the evidence.

Respondent contends that its "motive or motives in closing its plant are determinative of whether the shut-down was or was not a lock-out" and argues that the plant was shut down not to discourage membership in the U. A. W. but "first, because the plant was in a turmoil and employees were sacrificing the efficient operation of the plant while they argued over union matters, and Manager Johnston decided that the plant should be temporarily closed until the situation was clarified; and, second, because Manager Johnston had a genuine fear of a sit-down strike". The Board was not required to accept either of these explanations. While, as found by the Board, organization

was discussed extensively by the employees at the plant and in part during working hours, no attempt was ever made to curb such conversation, and no notice was ever given to the employees that efficiency had dropped and must be restored. It would seem strongly probable that if the "turmoil" had seriously hampered efficiency, steps would have been taken to quiet it prior to the taking of such an extreme measure as shutting down the plant. Moreover, the evidence does not bear out respondent's contention that plant efficiency dropped sharply in the period just prior to the shut-down. In all four of the departments covered by the evidence a chart submitted by respondent shows an increase in production for the two-week period ending February 28, over that for the preceding two-week period. Respondent urges, however, that in the retainer packing and retainer assembling departments (the two departments claimed to have been "hardest hit") the index for the average amount of work done per hour dropped from 62 to 52, and from 61 to 45 respectively from February 24 to 26. But this statistical conclusion is seen to be misleading when it is noted that in the retainer packing department for the five days preceding February 24, 1937, the average was 56, and the average for the period from February 24, 1937, to February 26, 1937, was 57. In the retainer assembling department, the average for the five day period was 53, as was the average of the period from February 24, 1937 to February 26, 1937.

With respect to the fear of a "sit-down" strike, L. A. Johnston testified that a former employee told him prior to the "shut-down" that a strike of the "sit-down" variety was imminent. This former employee (who had been convicted of commission of a felony) denied this story. Johnston stated that he believed the employee because he knew that "sit-down" strikes were prevalent at the time and because he noticed the unrest in the plant, and because he was told by his attorney that the U. A. W. was led by radicals. The Board declined to believe that Johnston put credence in the ex-employee's statement because at the time it was supposed to have been made "organization of the U. A. W. had just begun" and because respondent's own witnesses "testified that no one had any intimation of an impending strike before Johnston told them

of it on February 26". Of course we cannot question the Board's inferences from this state of the evidence.

Respondent's offered explanations for the shut-down thus disposed of, we think the Board was justified in view of the background evidence which showed the employer's hostility to the U. A. W. and of the evidence showing favoritism to the Union as against the U. A. W. subsequent to the "shut-down", in drawing the inference that the "shut-down" was for the purpose of interfering with the exercise by the employees of their right to self-organization and that such act had such an effect. And since the "shut-down" was a "mass discharge" as found by the Board and as shown by the fact that respondent sent employment severance statements and checks with a special endorsement indicating a discharge to the employees who had worn U. A. W. buttons, the Board had evidence upon which it could make a specific order, as it did do, requiring desistance from "discharges" for such purpose.

The portion of provision 1 (c) of the order which requires respondent to cease discouraging membership in any labor organization by "refusing to reinstate any of its employees, or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment" also finds support in the findings. The Board found that upon the reopening of the plant on March 8, 1937, certain of the employees were requested by respondent to return to work; that it was "made clear to the employees that a return to work meant a transfer of allegiance from one union to the other"; "that all of the employees understood quite clearly that returning to work meant joining the I. A. M"; that "willingness to reinstate employees only on the conditions above described, conditions which the respondent had no right to attach, is equivalent to absolute refusal to reinstate". These findings are supported by evidence. The Board has not found in terms that the refusal to reinstate discouraged or encouraged membership in a labor organization of respondent's employees. It is suggested that that fact is essential because there may lawfully be a refusal to reinstate. While there may lawfully be a refusal to reinstate employees as for lack of skill or ability, any discrimination in reinstating employees because

of union activity is prohibited by § 8. National Labor Board v. Mackay Co., 304 U. S. 333, 345–347, 58 S.Ct. 904, 82 L.Ed. 1381. The inescapable inference from the findings made by the Board is that the refusals to reinstate in this instance were discriminatory. Neither the findings nor evidence will support any other inference. Consequently, there is no occasion to perform the useless act of sending the case back to the Board to make such a specific finding. This provision of the order should be enforced. Ford Motor Co. v. N. L. R. B., supra, 305 U.S. at page 373, 59 S.Ct. at page 301; Federal Trade Comm. v. Curtis Co., supra, 260 U.S. at page 580, 43 S.Ct. at page 212, 67 L.Ed. 408.

Provision 1 (d) of the order requiring respondent to cease and desist "refusing to reinstate any of the employees listed in Appendix A", though cast in negative form, we consider to be in effect an affirmative order to reinstate employees. As such it is duplicated by provision 2 (a) of the order which in affirmative language directs respondent to offer unconditional employment to the same employees. Consequently, our discussion in connection with provision 2 (a) of the order presently to follow is equally applicable to this provision.

Provisions 1 (e), 1 (f) and 1 (g) of the order will be considered together. Provision 1 (e) orders respondent to cease "giving effect to its contracts with International Association of Machinists or Production Workers Local 1518". Provision 1 (f) of the order requires respondent to cease "recognizing Production Workers Local 1518 as the exclusive representative of its employees". Provision 1 (g) of the order requires respondent to cease "refusing to bargain collectively with [U. A. W.] as the exclusive representative of" a defined unit of its employees.

The Board found "that the production, maintenance and shipping employees of the respondent, exclusive of supervisory employees, foremen, regular clerical employees, and employees in the tool and die department constitute a unit appropriate for the purposes of collective bargaining and that said unit will insure to the employees of the respondent the full benefit of their right to self-organization and to collective bargaining and otherwise effectuate the policies of the Act". No contention is made that this finding is unsupported by the evidence. The Board further found "that on February 27 and on March 1, 1937, the U. A. W. had been freely designated as the bargaining agent of a majority of the employees in a unit appropriate for the purposes of collective bargaining". Also the Board made a "Conclusion of Law", which we think is in effect a finding of ultimate fact, that, "[U. A. W.] was on February 27 [1937], and at all times thereafter has been, the exclusive representative [of all the employees in the defined appropriate bargaining unit] for the purpose of collective bargaining within the meaning of section 9 (a) of the Act".

The Board has also found that on March 1, 1937, respondent entered into a contract with the I. A. M. which was treated by the parties, and was in effect a closed-shop contract. The Board found that this contract was but preliminary to a final closed-shop contract between the same parties which was signed on April 19, 1937. It is also found that the U. A. W. made a request to bargain with respondent by submitting a proposed contract which was received by respondent on the morning of March 1, 1937. This contract made no restrictions on the number of employees which it was to cover, and in fact included a provision expressly covering tool and die workers. The Board found that at this time the U. A. W. represented not only a majority of the workers in the appropriate unit, but a majority of the workers in the plant.

As to the entry into the contracts of March 1 and April 19, 1937, the Board found that: "The respondent thus signed a contract with a union which did not represent, and which it could not have thought represented, more than a handful of its employees, if any, and at the same time turned its back on a union which represented a majority of its employees in a unit appropriate for the purposes of collective bargaining, as well as a majority of the employees in any unit which the respondent could have considered appropriate. We do not find that the respondent, in the absence of more proof of the U. A. W. majority than was here given, could not have asked for that proof before entering into negotiations. But we do find that by hastily entering into a contract with the I. A. M. which it at all times treated as a closed-shop contract, it announced its firm intention to have nothing to do with the U. A. W. and preclud-

ed all further attempts on the part of that union to secure the recognition to which it was entitled. Such conduct constituted a refusal to bargain with the duly designated representative of its employees in an appropriate unit, and was an unfair labor practice within the meaning of the Act."

It is evident that if the finding that U. A. W. at all times was the representative of the appropriate bargaining unit is supported by the evidence, the provisions of the order [1 (e) and 1 (f)] are justified, since in such case the closed-shop contracts with I. A. M. and the Union could not have been entered into with an authorized representative as defined by section 9 (a) of the Act and consequently their making was an unfair labor practice as being a discrimination in condition of employment discouraging membership in a labor union which is prohibited by section 8 (3) of the Act. We think the evidence supports the finding.

The appropriate unit consisted of 96 employees, 49 of which would constitute a majority. The respondent concedes that 47 of them had freely designated U. A. W. as the bargaining agent by March 1, when the agreement between respondent and the I. A. M. was executed. The Board found that 65 of these employees had, at such time, designated U. A. W. As to 9 of the 18 employees as to whom question is raised, respondent contends that there is no evidence that they designated the U. A. W. as their bargaining agent. The contention rests on the argument that signatures on cards which were applications for membership in the U. A. W. were not properly identified. Without detailing the testimony, it is sufficient to say that the Board could properly infer from a union official's testimony that such persons had designated the U. A. W. as their bargaining agent. Thus without regard to the remaining 9 employees, as to whose representation there is dispute on other grounds, it appears that on March 1, 1937, the U. A. W. was the authorized representative of at least 56 employees in the appropriate unit. The Board found that one of these employees [Fred Turner] subsequently gained substantially equivalent employment. As to the remainder there is no contention made either that they lost the right to claim inclusion in the appropriate unit or that they rescinded their designation of the U. A. W. as their bargaining agent. Consequently, the familiar rule

that a state of affairs once shown to exist is presumed to continue to exist until the contrary is shown is applicable. Thus the finding of the Board that the U. A. W. was at all times the exclusive bargaining representative of the appropriate unit is supported by the evidence. Accordingly provisions 1 (e) and 1 (f) of the order must be enforced.

Likewise provision 1 (g) of the order, requiring respondent to cease and desist from refusing to bargain collectively with U. A. W. as the exclusive representative of the appropriate unit of its employees is proper. It is argued that this provision is unwarranted because since the U. A. W. sought on February 27, 1937 to bargain for all of the employees instead of the appropriate unit there has never been a commission of the unfair labor practice prohibited by section 8(5) of the Act. With this contention we cannot agree. In the circumstances the entry into the closed-shop contract with the I. A. M. by the respondent warranted the Board in finding that the respondent thereby "precluded all further attempts on the part of [the U. A. W.] to secure the recognition to which it was entitled" and that "such conduct constituted a refusal to bargain with the duly designated representative of its employees in an appropriate unit".

In a recent case this Court was presented with and disposed of an argument identical with that here made. We there said: "Respondent made no objection to the contract on the basis of the propriety of the unit for which it was being presented. The Board was entitled to draw the inference that respondent's refusal to negotiate with the Union was motivated, not by doubt as to the appropriate unit, but by a rejection of the collective bargaining principle. National Labor Relations Board v. Remington Rand, 2 Cir., 94 F. 2d 862, 868." National Labor Relations Board v. Biles Coleman L. Co., 9 Cir., 98 F.2d 18, 22.

Provision 1 (a) of the order commands respondent to cease and desist from in any manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in § 7, which activity is made an unfair labor practice by § 8 (1).

In our opinion this order as framed is a proper one. When the Board has made a finding, supported by substantial evidence, that an act has been done which

is prohibited as an unfair labor practice, the fair intent of the statute is that the Board is warranted in ordering desistance from such an unfair labor practice generally and is not required to limit its order so as to compel cessation only of the particular and limited activity found to have taken place.

Section 10 (a) of the Act, 29 U.S.C.A. § 160 (a), empowers the Board "to prevent any person from engaging in any unfair labor practice (listed in section 8 [158]) affecting commerce". Subsection (b) of section 10 provides for the filing of a complaint "Whenever it is charged that any person has engaged in or is engaging in any *such* unfair labor practice". Subsection (c) provides that if the Board be of the opinion that any person is engaging in "*such* unfair labor practice" it shall make its order requiring such person to cease and desist from "*such* unfair labor practice". (Emphasis supplied.) It thus appears that the Board is specifically authorized to order parties to cease and desist from the unfair labor practices "(listed in section 8)". Had Congress intended that the Board should be limited to requiring desistance from the particular mode found by the Board to have been followed in the past by the employer to accomplish a particular unfair labor practice no doubt it would have been provided that the Board should order desistance from the *act* by which the unfair labor practice was perpetrated. It is probable that Congress refrained from such limitation of the Board's authority as is here suggested in consideration of the evident fact that the methods by which a given unfair labor practice may be committed are so varied and numerous that the protection granted to employees by the Act would be largely ineffectual if each variation on the same theme necessitated a separate hearing and a specific prohibitory order.

█ That the Act is designedly framed to grant the Board power to restrain commission of the enumerated unfair labor practices rather than the method by which in the particular case they may be carried on is shown, we believe, by a comparison of section 10 of the Act with the statutory provisions in relation to the orders of the Federal Trade Commission (§ 5, 38 Stat. 719, as amended, 15 U.S.C.A. § 45). In most respects section 10 closely follows section 5 of the Federal Trade Commission Act (see, Ford Motor Co. v. Labor Board, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221) but whereas the Labor Act empowers the Board to enjoin enumerated and defined "unfair labor practices" the Trade Act only empowers the Commission to require desistance from the use of the "method of competition" which has been charged and which in the opinion of the Commission is "unfair". Had Congress not intended to allow for the issuance of the broader order by the Board, it seems reasonable to suppose that it would have followed the Trade Act in this respect, as it did in other closely related provisions.

We think it significant that without discussion the Supreme Court has at least twice given its specific approval to similarly worded orders. National Labor Relations Board v. Fansteel Metallurgical Corp., February 27, 1939, 59 S.Ct. 490, 83 L.Ed. 627; Consolidated Edison Co. v. Labor Board, 305 U.S. 197, note 8, at page 231, 59 S.Ct. 206, 83 L.Ed. 126.

Since, as we have seen above, the Board made findings, supported by evidence, that respondent had committed acts falling under the prohibition of section 8 (1) of the Act, the Board was warranted in ordering it to cease and desist from in any manner engaging in the unfair labor practice defined by that subsection in addition to specifically ordering desistance from the acts by which the practice was accomplished.

█ Provision 2 of the order requires respondent to take certain affirmative action to effectuate the purposes of the Act. Provisions 2 (a) and 2 (b) order the reinstatement of the employees found to have been discriminatorily discharged, with back pay from February 27, 1937 to the date of offer of reinstatement less any amounts earned during that period. Respondent argues against the enforcement of this order that it is invalid because there is no "express finding that each and all of the employees ordered reinstated with back pay 'had not found regular and substantially equivalent employment'". It is claimed that the lack of such finding invalidates the order because section 10 (c) authorizes the reinstatement only of "employees" who are elsewhere defined as those "who has not obtained any other regular and substantially equivalent employment". [§ 2 (3), 29 U.S.C.A. § 152 (3)].

We agree that only those who are "employees" within the Act definition at the time of the making of the Board's order may be ordered reinstated. National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 1938, 99 F.2d 533, 537. But that is not to say that an order to reinstate "employees" unaccompanied by specific finding that they have not gained substantially equivalent employment is for that reason invalid. National Labor Relations Board v. Carlisle Lumber Co., supra, 99 F.2d at page 542. Such finding though helpful to the Court is not essential to the validity of the order.

In the present case the Board has ordered reinstated 56 named individuals who are designated as "employees". Since the Board can only order individuals defined by the Act as "employees" to be reinstated, an order directing reinstatement of "employees" must be understood, in the absence of a contrary finding, as applicable only to those who are such within the Act's definition. Moreover, the Board after listing the "employees" went on to find that: "Two of the employees above named, Joseph Paul Kreig and Fred G. Turner, have obtained regular and substantially equivalent employment elsewhere since the date of the lock-out. As to four other employees, some question was raised as to whether they had procured such employment. [The Board found that the latter individuals had not obtained such employment.]" This finding is tantamount to a finding that the other individuals listed had not at the date of the order obtained other substantially equivalent employment. Particularly is this so in view of the fact that of the 50 persons ordered reinstated as to whom the Board made no express finding, the evidence shows that they had earned nothing or insignificant amounts subsequent to their discharge. Though these individuals were listed in the Intermediate Report and reinstatement was recommended as to them [as well as to the four employees as to whom the Board has specifically found no substantially equivalent employment was obtained] respondent in its exceptions to the Intermediate Report did not raise the point it now presses upon us. The Act provides that: "No objection that has not been urged before the Board, its member, agent or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." Section 10 (e).

We grant enforcement of the reinstatement and back pay orders as to 54 of the listed employees. These provisions of the order will not be enforced, however, as to Joseph Paul Kreig and Fred G. Turner, who have been found to have obtained substantially equivalent employment prior to the making of the order of the Board. We do not believe that we may, as urged by the Board, enforce only the back pay provision of the order as to these individuals, since the provisions as to reinstatement and back pay are, as framed, inseparable. National Labor Relations Board v. Carlisle Lumber Co., supra, 99 F.2d at page 543.

Respondent has raised a special question as to the reinstatement of Lucille Bronson, it being claimed that at the time of the making of the order she had returned to work for respondent. The evidence, however, discloses that after the "mass discharge" she did return to work but that she left after one day, upon learning that she would be required to abandon her U. A. W. membership because of the I. A. M. closed-shop. Thus the order is applicable to her as to the other discharged employees.

Provisions 2 (c), 2 (d), 2 (e) and 2 (f) of the order raise no special problem. Provision 2 (d) requiring respondent to bargain collectively with U. A. W. as exclusive representative of the appropriate unit is warranted as a direction of affirmative action to effectuate the purposes of the Act, since as seen above under the discussion of provision 1 (g) of the order, U. A. W. has been designated by the majority of the employees in the unit as their exclusive representative for the purpose of collective bargaining. Provisions 2 (c) and 2 (e) of the order are but ancillary to other provisions and are clearly within the discretion of the Board. Provision 2 (f) requiring respondent to report the extent to which it has complied with the order is expressly authorized by the Act, Section 10 (c).

Enforcement of the Board's order is granted in whole except as to provision 1 (b) thereof which provision is set aside, and except as to provisions 1 (d), 2 (a), 2 (b) and 2 (c), which are enforced as modified by making them inapplicable to Joseph Paul Kreig and Fred G. Turner.

GARRECHT, Circuit Judge (concurring)

I concur in the opinion of Judge STEPHENS.

I agree with that portion of Judge HANEY's opinion which says: "I think either union or the employer may seek and have the right to obtain, a decision of the Board as to the appropriate unit." This point is not referred to in the main opinion. However, I maintain that in this case the Board, on its own initiative, defined the proper bargaining unit. This does not seem to be conceded by Judge HANEY.

HANEY, Circuit Judge (concurring and dissenting).

First. Two provisions of the order sought to be enforced command respondent to cease and desist from in "any manner" causing a prescribed effect. Provision 1 (a) commands respondent to cease and desist from "In any manner interfering with, restraining, or coercing its employees in the exercise of" the rights guaranteed the employees by § 7 of the act, 29 U.S.C.A. § 157. Whether we should enforce such a provision depends on whether the Board has the power to make it. In determining whether the Board has such power, the intent of Congress is controlling, and our personal views as to what Congress *should* have done, or what power the Board *should* have are foreign to the issue, and are questions of policy to be exclusively determined by Congress.

Section 10(c) of the act, 29 U.S.C.A. § 160(c), empowers the Board to issue an order, as follows: "If upon all the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board * * * shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice * * *" Thus it is clear that the Board may order an employer to cease and desist from "such" labor practice. By use of the word "such" the unfair labor practice is the one previously described, that is the unfair labor practice in which "any person in the complaint *has engaged in or is engaging in.*" (Italics supplied.) What is the unfair labor practice

engaged in or which is being engaged in? It is the one described by § 8(1) of the act.

Section 8(1) of the act, 29 U.S.C.A. § 158(1), provides that it "shall be an unfair labor practice for an employer—(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157]." What is described by that language? I think it is apparent that there is no single act of interference, restraint or coercion. Those words cover a multitude of acts. It was manifestly intended to cover all acts which had the result or effect of interference, restraint or coercion. Thus it is apparent that the interference, restraint and coercion are not single things, but flow from and are descriptive only of the result or effect of many acts which may be done. In other words, the unfair labor practices were described, not by enumeration, but by their effect.

Just what did Congress include in the words "unfair labor practice"—the effect alone, the act alone, or both the effect and the act? As to the first of these possibilities, the order may be sustained only upon that ground. If only the effect of the act is the unfair labor practice, then the Board could properly order an employer who had caused the particular effect, to cease and desist from producing that effect.

I think it is clear that the unfair labor practice consists of both the act and effect. Not all acts are prohibited, but only those which have the described effect, and therefore the act alone cannot be the unfair labor practice. On the other hand, the unfair labor practice cannot consist of the effect alone, I think, because of the language of the act. By § 8(1) it is provided that it is "an unfair labor practice for an employer * * * To interfere with, restrain, or coerce employees". Reference to the dictionary shows that the words "interfere", "restrain" and "coerce" include and exist only by doing an act.[1] Section 10(c) likewise leads to that conclusion. The Board does not find that an employer "has engaged in or is engaging in" an effect, but an act which has a particular effect. Likewise the Board does not order the employer to cease and desist from an effect, but from doing something which produces the effect.

This is made abundantly clear by the committee reports. Section 8 (2) of the act, 29 U.S.C.A. § 158 (2), declares it to

---

[1] I use the word "act" in the sense of a failure to perform a duty. I think it is conceivable that in a given situation an employer might fail to act at all, and the effect would be caused by the failure to act.

be an unfair labor practice for an employer to dominate or "interfere with" the formation or administration of any labor organization. Discussing such provision, Senate Committee on Education and Labor Report No. 573, 74th Cong., 1st Sess., p. 10, states: "The so-called 'company-union' features of the bill are designed to prevent interference by employers with organizations of their workers that serve or might serve as collective bargaining agencies. Such interference exists when employers actively participate in framing the constitution or bylaws of labor organizations; or when, by provisions in the constitution or by laws, changes in the structure of the organization cannot be made without the consent of the employer. It exists when they participate in the internal management or elections of a labor organization or when they supervise the agenda or procedure of meetings. *It is impossible to catalog all the practices that might constitute interference,* which may rest upon subtle but conscious economic pressure exerted by virtue of the employment relationship. *The question is one of fact in each case * * *"* [Italics supplied.] See also: House Committee on Labor Report No. 969, 74th Cong., 1st Sess., p. 15–17; Id., Report No. 972, pp. 16, 17; Id., Report No. 1147, pp. 18, 19. From the foregoing it can be seen that the word "practices" meant acts which had the mentioned effect.

The effect of such construction is sustained by the few decisions discussing the particular question. Swift & Company v. United States, 196 U.S. 375, 393, 402, 25 S. Ct. 276, 49 L.Ed. 518; New York, New Haven R. R. v. Interstate Com. Comm., 200 U.S. 361, 382, 404, 26 S.Ct. 272, 50 L. Ed. 515; and see: McNeill v. Southern Railway Co., 202 U.S. 543, 563, 26 S.Ct. 722, 50 L.Ed. 1142; Bitterman v. Louisville & Nashville R., 207 U.S. 205, 228, 28 S.Ct. 91, 52 L.Ed. 171, 12 Ann.Cas. 693; Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 262, 273, 38 S.Ct. 65, 62 L. Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918 B, 461. The majority rely on a dictum in National Labor Relations Board v. Fansteel Metallurgical Corp., February 27, 1939, 59 S.Ct. 490, 83 L.Ed. 627, where the point was not considered. It is common knowledge that such a dictum usually fares badly when the point is actually considered. · 14 Am.Jur. 295, § 83.

Therefore I think the unfair labor practice is an act which has a particular effect; that when an employer engages in an unfair labor practice, he engages in an act which has a described effect; that the statute authorizes the Board to order the employer to cease and desist from doing an act which has the described effect, and which he "has engaged in or is engaging in"; and that therefore the Board is unauthorized to order an employer to cease and desist from doing an act which may have the described effect, if the employer has not engaged in or is not engaging in such an act. Since provision 1(a) of the order includes acts which the employer has not engaged in and which he is not engaging in, such provision should be limited as stated above.

Second. I concur with the majority that provision 1 (b) of the order should not be enforced on the ground that the act of the employer which is called "surveillance" was not found by the Board to have the "effect" required by the statute.

Third. I likewise concur in the enforcement of provision 1 (c) of the order insofar as it commands respondent to cease and desist from encouraging or discouraging membership in labor organizations "by discharging * * * any of its employees" because there were findings that the "lockout" was a discharge and the discharge did encourage and discourage membership in labor organizations. Those inferences from the evidence could rightly be taken by the Board.

That part of provision 1 (c) of the order which commands respondent to cease and desist from "in any manner" discriminating in regard to the hire and tenure of its employees, should not be enforced for the reasons stated under "First".

That part of provision 1 (c) of the order which commands respondent to cease and desist from discouraging and encouraging membership in labor organizations by "refusing to reinstate" the employees, should not be enforced, I think, because of the absence of proper findings. The majority concede that there is no express finding "that the refusal to reinstate discouraged or encouraged membership in a labor organization". It proceeds, however, to eke out the Board's findings by inference that the refusal to reinstate did have the prescribed effect. I think the action of the majority is wrongly taken, and the inference almost wholly erroneous.

As a matter of policy, this court should not adopt the practice of eking out the Board's findings by inference, because (1) there is the lurking danger that we may draw an inference which the Board would not draw; (2) the Board's duty is to consider all evidence, while our duty is only to ascertain whether findings made are supported by the evidence; and (3) unless we insist upon precise findings there is danger that the Board may carelessly leave a progressively larger number of facts to be ascertained by inference. The authority relied on by the majority makes it clear that the normal course is to remand for findings, but that in exceptionally clear cases we need not do so. Federal Trade Commission v. Curtis Co., 260 U.S. 568, 580, 43 S.Ct. 210, 67 L.Ed. 408. This court has consistently followed the normal course of remanding so that findings shall be made. Doernvecher Mfg. Co. v. Commissioner, 9 Cir., 80 F.2d 573; Fulton Oil Co. v. Commissioner, 9 Cir., 81 F.2d 330; Eaton v. Commissioner, 9 Cir., 81 F.2d 332; Von's Inv. Co. v. Commissioner, 9 Cir., 92 F.2d 861; Kelleher v. Commissioner, 9 Cir., 94 F.2d 294; United States v. Nez Perce County, Idaho, 9 Cir., 95 F.2d 232, 236. See also: Interstate Circuit v. United States, 304 U.S. 55, 58 S.Ct. 768, 82 L.Ed. 1146; United States v. Esnault-Pelterie, 299 U.S. 201, 206, 57 S.Ct. 159, 81 L.Ed. 123. The majority point to no facts, and the record discloses none, which justify a special dispensation to the Board in this case.

I further believe the "inescapable" inference drawn does violence to the record. The majority make no attempt to justify the inference by reference to any finding or evidence. Examination thereof shows that membership in the U. A. W. was apparently not discouraged, as shown by the Board's finding: "Two more employees signed applications on February 27; two more on February 28; four on March 1; and four have signed since March 1". No findings disclose that others might have joined, or that some joined the I. A. M., because of the refusal to reinstate. How the inference is supported is left wholly to conjecture, and it seems to me to be plainly wrong to make such an inference in view of the foregoing.

Fourth. Provision 1 (d) requires respondent to cease and desist from refusing to reinstate 56 men. There may lawfully be a refusal to reinstate such men.

National Labor Relations Board v. Mackay Co., 304 U.S. 333, 345, 346, 58 S.Ct. 904, 82 L.Ed. 1381. The legality of the refusal to reinstate here is dependent upon whether or not such refusal encouraged or discouraged membership in labor organizations, a point upon which we have no finding, and for reasons stated under heading "Third" above, I think the cause should be remanded. Since it should be remanded I think the Board should be directed to find whether or not any or all of the 56 men were employees of respondent on February 18, 1938, the date of its order, in conformity with National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533, 537.

Fifth. Provision 1 (e) of the order requires respondent to cease and desist from giving effect to the "so-called" contract of March 1, 1937 and the contract of April 19, 1937.

With regard to the March 1st contract, the majority gratuitously assume that it was a "closed-shop" contract and void it on the ground that it was not authorized by § 8 (3) of the act. That action is, in my opinion, wholly unwarranted under the Board's findings, and I think there should be some judicial self restraint with respect to the interpretation of such findings. The contract, by its terms gives no indication that it was a "closed-shop" contract, and the Board did not find that it was. It found that respondent "treated" it as such. While the practical interpretation of a contract by one of the parties may be considered in determining what the parties intended by certain language, that rule, of course, has no application here because there was no language to interpret. In addition, it is not unusual for one party to misinterpret a contract, as shown by the countless cases on that subject. No doubt the Board was aware of that situation for it declined to find that it was a "closed-shop" contract to be voided under § 8 (3) of the act. It did find that respondent's conduct in hastily entering into such contract "constituted a refusal to bargain with the duly designated representative of its employees in an appropriate unit" and was, therefore, an unfair labor practice within the meaning of § 8 (5) of the act. The action of the Board was correct if the U. A. W. was such representative, a question discussed below.

The April 19th contract, however, is in a different category. The request to bar-

gain had already been refused by the March 1st contract. There is no finding that the April 19th contract refused any request whatever. It seems clear that it was not a refusal of a request already refused. Therefore its validity is dependent upon § 8 (3) of the act. The proviso of that section is that a "closed-shop" contract between the employer and a labor organization is not precluded by the act "if such labor organization is the representative of the employees as provided in section 9 (a), 29 U.S.C.A. § 159 (a) in the appropriate collective bargaining unit covered by such agreement when made".

Respondent's employees numbered 122. Of that number 96 we may term "production" employees. The Board found that the appropriate unit consisted of the 96 production employees. If it is intended to find that such unit was the one by which the validity of the April 19th contract is to be tested, I think it is clear that such action was wholly without authority. The statute fixes the unit to be the one "covered by such agreement when made" and the Board has no power to change such a unit agreed upon. The question, therefore, is: was the I. A. M. the designated representative of a majority of the 122 employees on April 19, 1937? Upon that question we have no finding whatever. The findings of the Board are directed to a smaller unit, as is the "conclusion" treated as a finding by the majority, contrary to United States v. Esnault-Pelterie, 299 U.S. 201, 206, 57 S.Ct. 159, 81 L.Ed. 123. For reasons stated under heading "Third", above, I think we should remand the cause with directions to make a finding upon this question.

Sixth. The legality of provisions 1 (b) and (g) and of 1 (e) as relates to the March 1st contract, is dependent upon whether or not the U. A. W. was the designated representative of a majority of the employees "in a unit appropriate for such purposes".

The U. A. W. on March 1st requested respondent to bargain with it as the representative designated by 122 of the employees. Its request claimed the entire group as a unit. The Board found that respondent committed an unfair labor practice by refusing to bargain with the representative of a smaller unit consisting of only 96 employees. I think the Board was without authority for that action as taken.

It is clear from the legislative history of the act that Congress did not intend to favor one independent union over another. There is nothing to indicate that the Board was intended to delve into the ordinary affairs of such unions. In the normal course of events, when a union presents a request to the employer to bargain, the employer is concerned only with the question as to whether such union is the designation of a majority of the employees in the unit claimed. If he grants the request, no question arises for the Board to determine. On the other hand, if he believes the union has not been designated by a majority, he may refuse the request, but such decision, like many others necessary for an employer to make, must be shown to be correct in the event of a proceeding begun before the Board. He runs the risk of an adverse decision by the Board, the same as he runs the risk that other decisions on business affairs will not be upheld by the courts.

In case of such a dispute before the Board, it may not change the unit claimed, because, as will appear, such action would favor one independent union over another. In the case where a small craft unit has a contract with an employer, and subsequently a majority of the other employees designate another union, which requests the employer to bargain for such employees, the question arises. Upon refusal, if the majority happened also to be a majority of the total employees including the craft unit, then to hold that the Board may change the unit claimed by the union is to hold that the Board may select the entire plant unit and thus drive the craft unit out of existence although it may have been established in the plant for many years prior to the organization of the second union. I think there was no intent of Congress to force the craft unit to risk its existence upon the inclination of the Board in such cases.

It appears to me that, in reason, Congress expected the requests to bargain to be considered in the order of receipt, upon the equitable maxim "he who is first in time is best in right". Salem Trust Co. v. Manufacturers' Co., 264 U.S. 182, 192, 44 S.Ct. 266, 68 L.Ed. 628, 31 A.L.R. 867; 19 Am.Jur. 336, § 486. Under that construction, the craft unit would be perfectly secure under its contract, which would prevent the later union from annihilating the smaller. In such cases, there would be

no unfair labor practice in refusing to bargain for the entire group. The later union would be compelled to restrict its claim to a unit of employees not already represented by another unit.

In this connection, § 9 (b) provides that the Board "in each case" shall decide what unit is appropriate. A "case" would not exist in the situation where only one union was connected with the employees, because the employer may question only the representation, but not the unit. I think § 9 (b) is applicable only when a "case" arises, i. e. where two rival unions, before the employer has taken action on any bargaining request, request bargaining privileges, claiming units which overlap in their scope. In that situation, the employer by refusing one request and granting the other may subject himself to the charge of an unfair labor practice, and at the same time, the smaller unit risks its existence upon the decision of the employer. I believe that in such situation the Board "shall" decide what unit is appropriate on the basis, as specified in the statute, of what unit will "insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this Act". Where such a situation arises, I think either union or the employer may seek and have the right to obtain, a decision of the Board as to the appropriate unit. With respect to the right of the employer to compel a decision of that question, the policy of the act as stated in § 1, 29 U.S.C.A. § 151, is, among other things, "to eliminate the causes of certain substantial obstructions to the free flow of commerce * * *". Nothing in the act or its legislative history indicates that such obstructions were to be eliminated only in the event that an employee or union requested it.

Here both the I. A. M. and the U. A. W. presented requests to bargain. Without invoking § 9 (b) of the act, respondent chose to refuse the request of the latter. In doing so, respondent committed an unfair labor practice, if the U. A. W. had been designated as the representative of a majority of the employees in the unit claimed, which was the entire group of 122 employees. I concur with the majority that 56 had designated the U. A. W. In addition, respondent stipulated that one Whaley was an employee, which must now prevail over the contention that he actually was not. To these 57 must be added five employees whom respondent seeks to exclude on the ground that they did not "freely" designate the U. A. W. but did so under coercion. The act does not require the absence of coercion. The legislative history clearly shows that the Board was to accept the designation as made by the employees and not concern itself with the debatable question as to what constitutes coercion; and that the employees had ample remedies then existing to prevent their own coercion by anyone other than the employer. House Committee on Labor, Report No. 969, and No. 972, 74th Cong., 1st Sess., pp. 13–15; Id., Report No. 1147, pp. 16–17; Senate Committee on Education and Labor, Report No. 573, 74th Cong., 1st Sess., p. 16; 79 Cong. Rec. pp. 7949–7960; 7967–7973, 10107.

Thus 62, a majority of 122, had designated the U. A. W. as their representative, and respondent committed an unfair labor practice in refusing to bargain with it on March 1st.

Seventh. Provisions 2 (a) and (b) of the order requiring reinstatement of the employees with back pay, I think, should not be enforced because of the absence of the finding mentioned in heading "Third" above.

Eighth. Provision 1 (d) of the order requires respondent to bargain with the U. A. W. upon request as the representative of the production employees, a unit consisting of 96 employees. Since the I. A. M. intervened in the proceeding, claiming the right to represent these employees, a "case" was made requiring decision by the Board, and its decision as to the appropriate unit does not appear to be erroneous. However, since the April 19th contract may be valid, in which event provision 1 (d) would become inoperative, I think enforcement of that provision should await the findings to be made on remand.

For reasons above expressed, I dissent from the conclusion of the majority that the order should be enforced in its entirety except provision 1 (b) and other minor modifications. I think the parts of provisions 1 (a), 1 (c) and 1 (e) approved in the foregoing opinion, and provisions 2 (c), 2 (e) and 2 (f) should be enforced; that as to the remaining provisions, enforcement should be withheld, and the cause remanded to the Board for additional findings.