## CLOVER FORK COAL CO. v. NATIONAL LABOR RELATIONS BOARD.
### No. 7897.

Circuit Court of Appeals, Sixth Circuit.
June 8, 1938.

Cleon K. Calvert, of Pineville, Ky., and Forney Johnston, of Birmingham, Ala. (Cleon K. Calvert, of Pineville, Ky., on the brief), for petitioner.

D. B. McCalmont, Jr., of Washington, D. C. (Charles Fahy, of Washington, D. C., and Philip G. Phillips and Leonard Shore, both of Cincinnati, Ohio, on the brief), for respondent.

Before HICKS, SIMONS and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

The petitioner, a Kentucky corporation engaged exclusively in coal mining at Kitts, Harlan County, Kentucky, seeks to set aside a cease and desist order of the National Labor Relations Board requiring it to discontinue unfair labor practices and to reinstate with compensation employees discharged for union activities. The Board answered, and, alleging noncompliance with its order, petitioned for its enforcement.

The petitioner has 2,000 acres of land in Harlan County, Kentucky, of which 1,250 acres are coal land. It owns and operates its coal mine and equipment thereon, the tipple which separates coal into different sizes, and the houses in which most of its employees live. It produces about 300,000 tons of coal a year, which it delivers from its mine tracks and tipple to cars of the Louisville & Nashville Railroad, by which the bulk of it is transported in interstate commerce to other states, though some is utilized by the railroad in its Kentucky operations. All of the coal produced by the petitioner is sold to Walter Bledsoe & Company, a national coal sales company, having its principal office at Terre Haute, Indiana, and maintaining branch offices in other states. The petitioner has an oral contract with Bledsoe's Cincinnati office for the exclusive sale to it of its coal. Shipping instructions are received by mail or telephone from the Cincinnati office and settlements are made monthly by Bledsoe on the basis of market price less 8%. The coal is sold to Bledsoe f. o. b. the mine. The petitioner employs in its mining, sorting and loading operations, about 240 men, none of whom are employed in interstate transportation. When the coal is loaded into railroad gondolas at the tipple title thereto passes to Bledsoe, by whom it is shipped to destination at its risk and expense.

Efforts to unionize the petitioner's employees made by a local union affiliated with the United Mine Workers of America met with firm resistance from the petitioner and many of its non-union employees, culminating in the alleged discharge of some sixty men who had joined the union. Upon charges of unfair labor practices made to the Board it issued its complaint against the petitioner, alleging unfair labor practices in violation of § 8, (1), (2) and (3), and § 2, (6) and (7) of the National Labor Relations Act, 29 U.S.C.A. §§ 158 (1–3), 152(6, 7), and upon full hearing before the trial examiner, reviewed by the Board, the cease and desist order issued.

Though denying engaging in unfair labor practices, and discharging employees because of union affiliation, and asserting that the eighteen or twenty of its employees only who had been expelled from its camp by its non-union men because they refused to work with union men had been driven away as a result of a strike that was purely spontaneous and not incited by it, the principal ground upon which we are asked to set aside the Board's order is that the petitioner is not subject in its purely local activity to the jurisdiction of the Board, since the petitioner is not engaged in interstate commerce, its operations do

not affect such commerce, and its entire activity is carried on within the State of Kentucky. All of its employees, it asserts, are wholly engaged in an occupation local to and within that state, and neither it nor they have ever been engaged in any activity connected with or affecting commerce or the flow or stream of such commerce.

Following the decisions in Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, it was thought in this and other circuits that the National Labor Relations Act, 29 U.S. C.A. § 151 et seq., did not extend the jurisdiction of the Board thereby created to activities which were local and affected commerce, if at all, indirectly. National Labor Relations Board v. Jones & Laughlin Steel Corp., 5 Cir., 83 F.2d 998; Fruehauf Trailer Co. v. National Labor Relations Board, 6 Cir., 85 F.2d 391; and National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 2 Cir., 85 F.2d 1. However, in a series of cases, of which National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, contains the dominating argument, the several Courts of Appeals were reversed, and it was held that (page 625) "The close and intimate effect which brings the subject within the reach of Federal power may be due to activities in relation to productive industry although the industry when separately viewed is local," and in the language of the first Coronado Case, United Mine Workers v. Coronado Co., 259 U.S. 344, 408, 42 S.Ct. 570, 582, 66 L.Ed. 975, 27 A.L.R. 762, that "If Congress deems certain recurring practices though not really part of interstate commerce, likely to obstruct, restrain or burden it, it has the power to subject them to national supervision and restraint," and that the Schechter and Carter Cases do not hold otherwise.

The rationale of the Jones & Laughlin, Fruehauf Trailer, and Friedman-Marks Clothing Company Cases was not that there was apparent in each of them a continuous flow of interstate commerce through the state, and that they were thereby to be distinguished from the Schechter Case, where goods transported in interstate commerce had come to rest within the state, and from the Carter Case, where local products had not yet entered the stream of interstate commerce, for as more fully explained in the recent case of Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 58 S.Ct. 656, 82 L. Ed. ——, decided March 28, 1938, the metaphor of a stream of commerce while it may illustrate the protective power which Congress may exercise is not exclusive, and the congressional authority is not limited to transactions deemed to be an essential part of a flow of commerce, for burdens and obstructions may be due to actions springing from other sources, including labor disputes, irrespective of the origin of materials or the place where sales are made, and in this respect "there is obviously no difference between coal mined or stone quarried, and fruit and vegetables grown." (Page 660.)

The petitioner presents an interesting analysis and classification of the cases, from which it derives that they fall into three classes, (1) those in which the employer is clearly engaged in interstate commerce and the work of his employees is functional to such commerce, (2) those in which the employer's business has been so integrated upon a national basis with raw materials coming into and manufactured products going out of the state that there has been established a flow of interstate commerce in respect to it, (3) those in which the labor relation is not in interstate commerce and in which there is no integrated national activity, but which become subject to regulation under the commerce clause because the specific activity regulated is alleged to have a direct and adverse impact upon interstate commerce. The first group is typified, the petitioner says, by National Labor Board v. Pennsylvania Greyhound Lines, 58 S.Ct. 571, 82 L.Ed. —— decided February 28, 1938, the second by the Jones & Laughlin and associated cases, and the third by the Santa Cruz Case. The present case, it urges, is to be analyzed according to principles applicable to the third group, in consequence of which the practices of an employer whose business is not in interstate commerce or in the stream of commerce by reason of production in transit but whose activity is sought to be regulated because it affects commerce, are without the scope of the Act unless the immediacy and directness of their impact upon interstate commerce is established. Otherwise jurisdiction may not attach under the statute.

The contention is interesting but not persuasive, nor supported by implications to be drawn from the Santa Cruz Case. There the petitioner was engaged in canning, packing and shipping fruit and vegetables the bulk of which were grown locally. There, as here, the product was sold to an out-state purchaser f. o. b. the place of production or processing. The court expressly held that there was no question that petitioner was directly and largely engaged in interstate commerce since it had often decided that sales to purchasers in another state are not withdrawn from Federal control because the goods are delivered f. o. b. within the state of origin for transportation, a large part of the interstate commerce of the country being so conducted, and arrangements between seller and purchaser with respect to the place of taking title or as to the payment of freight where the actual movement is interstate does not affect either the power of Congress or the jurisdiction of the agencies which Congress has established, citing Pennsylvania Railroad Co. v. Clark Bros. Coal Mining Co., 238 U.S. 456, 465, 468, 35 S.Ct. 896, 59 L.Ed. 1406. So the classification of the Santa Cruz Case as one where the employer is not engaged in interstate commerce we think must fail.

But even if the classification be valid, there is still no comfort for the petitioner in the Santa Cruz Case. True, it was there said that the direct relation of the labor practices and the resulting labor dispute to interstate commerce, and the injurious effect upon that commerce, were fully established. Indeed the court went much further, saying that it would be difficult to find a case in which unfair labor practices had a more direct effect upon interstate commerce. But the directness and immediacy of the effect of labor practices upon interstate commerce in an extreme case furnishes no immunity from regulation in one less conclusive, nor a test of jurisdiction thereover. The court recognized in the Jones & Laughlin Case that the National Labor Relations Act but preserves to employees a fundamental right to self-organization, that interference with that right leads to industrial strife, and that such strife has an effect upon interstate commerce that is immediate and may be catastrophic. This was said of an industry nationally organized, but was applied in the Santa Cruz Case to an industry as purely local in its primary activity as is that of the petitioner.

It is said that no strike or threat of strike has resulted from the petitioner's alleged unfair practices, and that no inference with respect to strife in its labor relations affecting interstate commerce may be drawn from the experience of the coal industry as a whole. But this in no wise differentiates the present case from adjudicated precedents. Like the steel plants, coal mining is also a basic industry of the United States, the ramifying activities of which affect interstate commerce at every point, and the court said in the Jones & Laughlin Case, "The fact that there appears to have been no major disturbance in that industry in the more recent period did not dispose of the possibilities of future and like dangers to interstate commerce which Congress was entitled to foresee and to exercise its protective power to forestall." This reasoning is brought into relief by the dissenting Justices in the Labor Board Cases, National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 87, 57 S.Ct. 645, 630, 634, 81 L.Ed. 921, 108 A.L.R. 1352, who point out in respect to the clothing company there involved that there was no evidence of a strike by its employees at any time, or that one was threatened, and nothing to indicate the probable result if one should occur.

It must, we think, be concluded that it is the prevention of strikes, the impact of which upon interstate commerce when and if they occur will directly and immediately burden or obstruct such commerce, that furnishes the ground for the exercise of the Congressional power. The immediacy and directness of the effect of industrial strife upon interstate commerce is the test of jurisdiction, and unfair labor practices fall within the scope of the Act by reason of the fact that long and painful experience teaches that in the generality of cases, if not in particular instances, they lead to such strife. The Board found, upon evidence, substantial and so conclusive, that strikes and labor disputes in coal areas even remote from the Appalachian area which includes Kentucky have had serious repercussions there, and that interference in the production of coal in any principal area has the effect of disrupting transportation in interstate commerce even to the extent of materially affecting the financial status of coal carrying railroads involved. In the Santa Cruz Case the strike had already begun, and so its effect upon commerce was at once clearly established. But

the purpose of the Act is remedial rather than punitive, and the court has recognized the protective power of Congress to "foresee" and "forestall."

The contention that employees were not discharged because of union activities by the petitioner but were forced out by the determined attitude of the petitioner's non-union men in refusing to work with members of the United Mine Workers, must be rejected in view of evidence which supports findings that the attitude of the petitioner's non-union men was, if not inspired by, at least encouraged and promoted by the petitioner and its agents. The offer to prove by 200 of its employees that they would have left the mine had the union men continued in employment should, of course, have been received, but taking the avowal as evidence, it would still be beyond our power to overthrow the findings of the Board in the face of evidence that they were subject to coercion, intimidation, and threat to close the mine.

The contention that the assailed order arbitrarily and unreasonably requires reinstatement of discharged employes with compensation and the posting of notices that petitioner will cease its unfair labor practices differs not at all from contentions heretofore made in other cases. The relief which the statute empowers the Board to grant is to be adapted to the situation which calls for redress. National Labor Relations Board v. Pennsylvania Greyhound Lines, supra; National Labor Relations Board v. Mackay Radio & Telegraph Co., 58 S.Ct. 904, 82 L.Ed. —— decided May 16, 1938. The assailed order does not go beyond those in other cases sustained.

The petition to set aside the order of the Board is denied. The Board's petition for enforcement is granted.