## NATIONAL LABOR RELATIONS BOARD v. SUNSHINE MINING CO.

### No. 9162.

Circuit Court of Appeals, Ninth Circuit.

April 3, 1940.

Rehearing Granted, Decree Confirmed June 19, 1940.

Charles Fahy, Gen. Counsel, Robert B. Watts, Laurence A. Knapp and Malcolm F. Halliday, Asst. Gen. Counsels, and Leonard Appel, Atty., all of National Labor Relations Board, all of Washington, D. C., for petitioner.

Joseph C. Cheney, of Yakima, Wash., for respondent.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

The National Labor Relations Board has filed a petition in this court to enforce an order issued by it in proceedings which it instituted against the respondent, the Sunshine Mining Company. Respondent is a Washington corporation with its home office at Yakima, Washington. It maintains its principal place of business at Kellogg, Idaho.

The complaint, as amended, in addition to jurisdictional allegations, alleges the following material matters: that respondent had interfered with, restrained, and coerced its employees in the exercise of their rights guaranteed in Section 7 of the National Labor Relations Act, 49 Stat. 449, 452, 29 U.S.C.A. § 157, by directing a campaign of propaganda, threats, and terrorization against the International Union of Mine, Mill and Smelters Workers (herein referred to as the Union), which is affiliated with the Committee of Industrial Organization, and by utilizing the device of a company-sponsored petition and election for the purpose of destroying the Union; that respondent had refused to bargain with the Union on June 28, July 9, and August 2, 1937, although the Union was then the representative of a majority of the employees in the appropriate unit for collective bargaining purposes; that by reason of this course of conduct a strike was called by the Union on behalf of respondent's employees; that respondent discharged and refused to reinstate over two hundred named employees because they had engaged in concerted activities through the Union for the purposes of collective bargaining and other mutual aid and protection; that respondent formed, dominated, and contributed support to a labor organization known as the Big Creek Industrial Union; and that by reason of the foregoing acts, respondent had violated Section 8(1), (2), (3), and (5) of the Act, 29 U.S.C.A. § 158(1, 2, 3, 5). Respondent filed an answer in which it denied that it was subject to the Act and denied that it had engaged in the unfair labor practices alleged.

The Big Creek Industrial Union, concerned herein, is an incorporated, unaffiliated labor organization admitting to its membership all the respondent's employees, including supervisory employees, who are not given voting rights. This union (hereinafter referred to as the Big Creek Union) was permitted to intervene in these proceedings and was represented by counsel and was afforded full opportunity to be heard, to examine witnesses, and to introduce evidence bearing on the issues.

At the close of the hearing the trial examiner granted a motion of counsel for the Board to amend the complaint to conform to the evidence.

The Board's findings of fact, conclusions of law, and order are summarized as follows: Respondent is a Washington corporation engaged in the extraction, mining, and milling of silver ore at its mine located near Kellogg, Shoshone County, Idaho. Rated as the largest producer of silver in the United States, respondent in the year 1936 mined and milled 215,949 dry tons of ore, which yielded some 9 million ounces of

silver and considerable quantities of other metals. After reducing its ore to concentrate form, respondent transfers it to the Bunker Hill and Sullivan Mining and Concentrating Company, herein called the Smelter Company, under the terms of an exclusive sales contract containing the following terms:

"The Seller hereby agrees to sell and deliver to the Buyer, and the Buyer agrees to accept and purchase from the Seller at the prices and upon the terms and conditions hereinafter stated, the total output of ores mined and extracted from the mines and mining properties owned or controlled by the Seller situated in the Big Creek Mining District, Shoshone County, Idaho, together with all concentrates and mill products of every nature produced from ores owned or controlled by the Seller, for a period of five (5) years * * * all such ores, concentrates, and products, hereinafter designated as 'product', to be delivered by the Seller to the Buyer, f.o.b., railroad cars at the Bunker Hill Smelter located at Bradley, Idaho.

\* \* \* \* \* \*

"During the life of this agreement said Buyer agrees to pay in lawful money of the United States to the Seller for said product and the Seller agrees to receive in full payment for said product, in each and every lot shipped hereunder, at the following prices and upon the following terms * * *."

The concentrate is processed at the Kellogg plant of the Smelter Company and from there the finished silver bars are shipped to the United States Mint at San Francisco, California. The gold recovered is sent to the United States Assay Office at Seattle, Washington, while the copper and lead in substantial quantities are sold in the open market outside the State. The Board found that the operations of respondent and the Smelter Company constitute a direct and continuous flow of commerce across state lines. Respondent in 1936 purchased materials, equipment, and other items necessary to its operations, totaling approximately $700,000, sixty per cent of which were transported to respondent's mine from outside the State of Idaho.

The Board found that respondent, by manifold anti-union activities, had interfered with, restrained, and coerced its employees within the meaning of Section 8(1) of the Act; that a majority of its employees in the appropriate unit had, on June 28, July 9, and August 2, 1937, and thereafter, designated the Union as their representative for collective bargaining; that respondent, on these dates, had refused, not only to bargain collectively with the Union, but to embody understandings, if reached, in a written signed agreement, although requested by the Union so to do, thereby committing unfair labor practices within the meaning of Section 8(5) of the Act; that the strike of respondent's employees on August 2 was caused by this refusal to bargain; that respondent, on August 18, 1937, discriminated against all of its striking employees in regard to their hire and tenure of employment in violation of Section 8(3) of the Act; and that respondent, by dominating and interfering with the formation and administration of the Big Creek Union and contributing support thereto, had engaged in unfair labor practices within the meaning of Section 8(2) of the Act.

Upon the foregoing findings of fact, the Board concluded that respondent had engaged in and was engaging in unfair labor practices within the meaning of Section 8(1), (2), (3), and (5) and that they were unfair labor practices affecting commerce within the meaning of Section 2(6) and (7) of the Act, 29 U.S.C.A. § 152.

Accordingly, the Board ordered respondent to cease and desist (a) from discouraging membership in the Union by discrimination in regard to hire and tenure of employment; (b) from in any manner dominating or interfering with the administration of the Big Creek Union or with any other labor organization of its employees or contributing support thereto; (c) from refusing to bargain collectively with the Union; and (d) from in any other manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed by Section 7. As affirmative action which it found would effectuate the policies of the Act, the Board directed respondent to offer reinstatement with back pay to all employees who went on strike on August 2, 1937; to withdraw all recognition from and disestablish the Big Creek Union as representative of its employees for collective bargaining; and to post appropriate notices. The Board's order also included the further affirmative requirement that respondent bargain collectively, on request, with the Union as exclusive representative of all employees in the appropriate unit, with respect to rates of pay,

wages, hours, and other conditions of employment, and if an understanding is reached on such matters, "embody said understanding in a written signed agreement for a definite term, to be agreed upon, if requested to do so" by the Union.

### Upon the Question of Jurisdiction.

Throughout these proceedings respondent has challenged the jurisdiction of the Board, contending it was not engaged in any business which substantially affected interstate commerce. This contention is renewed here, and, in addition, respondent filed a motion in this court to dismiss the petition, claiming that, in any event, there had been a termination of jurisdiction and in support thereof filed affidavits to the effect that on and before the 1st day of August, 1938, respondent wholly ceased purchasing any supplies, materials, machinery, equipment, or other articles of whatsoever kind or nature from any seller located outside the State of Idaho, and that since said 1st day of August, 1938, all purchases of whatsoever kind or character have been made by respondent in Idaho, by an Idaho contract with an Idaho seller, that is, from an Idaho concern regularly doing business in the State of Idaho and with a place of business in the State of Idaho, and that all of such purchases have been delivered to the respondent in Idaho by such Idaho seller.

It is asserted that the situation in this case is exactly the same as in National Labor Relations Board v. Idaho-Maryland Mines Corp., 9 Cir., 98 F.2d 129, 131. Without going into detail we deem it sufficient to say that the facts in that case are different from those found here. There the California mining concern sold its output to the United States in California, and the court in that case did not consider those transactions as commerce at all, but in relation thereto said: "We regard such shipments, not as commercial transactions, but as administrative acts of Government."

■ As to the motion to dismiss upon the contention that on August 1, 1938, "all possible jurisdiction of the Board and all possible application of the Act over and to respondent and its labor relations wholly ceased and terminated, and such loss of jurisdiction wholly prevented this Court from obtaining jurisdiction upon the filing of the petition in April, 1939", it must be pointed out that this motion supported by these ex parte affidavits are advanced for the first time in this court in answer to the petition to enforce the order of the Board. Such practice is not in harmony with orderly procedure. "The case must be heard on the record as certified by the Board. The appropriate procedure to add facts to the record as certified is proscribed [sic] in Section 10(e) of the Act [29 U.S.C.A. § 160(e)]." National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 208, 84 L.Ed. ——.

■ The fact that the company, instead of itself buying all its supplies outside the state and shipping them in, as the record shows it did, now has some arrangement whereby someone else ships them in and then it buys them from the shipper after they come into the state, does not destroy the effect of the transactions on interstate commerce. In any event, these purchasing operations do not dispose of the interstate character attaching to practically all of the production of its mines which finds its way into interstate commerce.

■ The arrangement between the respondent and the Bunker Hill Company as to title and the incidents of ownership does not change the essential fact that these transactions between the two corporations together constitute a direct and continuous flow of commerce across state lines to the mint and market.

■ That a labor dispute which would shut down the vast mining operations of respondent and suspend all its business relations, as shown by the evidence, would have a very noticeable effect on interstate commerce, hardly requires support from the citation of authority. It is not necessary to show actual disruption of commerce where prevention is the purpose of the Act. That a strike in respondent's mine would result in interference with and injury to this commerce is evident, and "it cannot be maintained that the exertion of federal power must await the disruption of that commerce." Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 222, 59 S.Ct. 206, 213, 83 L.Ed. 126.

"Long before the enactment of the National Labor Relations Act it had been many times held by this Court that the power of Congress extends to the protection of interstate commerce from interference or injury due to activities which are wholly intrastate." National Labor Relations Board v. Fainblatt, 306 U.S. 601, 605, 59 S.Ct. 668, 671, 83 L.Ed. 1014.

"We have often decided that sales to purchasers in another state are not withdrawn from federal control because the goods are delivered f.o.b. at stated points within the state of origin for transportation." Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 463, 58 S.Ct. 656, 659, 82 L.Ed. 954.

"Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352.

The transcript of record in this case comprises more than 3,000 printed pages. There are over 270 exhibits; some of these contain as many as ten exhibits under one heading, a number of which are many pages long and include hundreds of names. To detail the evidence would extend this opinion into a book, without adding anything of legal value to the points to be discussed. It is sufficient to outline those facts which were found by the Board and which are supported by substantial evidence.

### As to the Charge of Unfair Labor Practices.

Respondent's mine is located in the Coeur d'Alene mining district in Idaho between the towns of Wallace and Kellogg in that state. At both of these points the Union had locals—No. 14 at Wallace and No. 18 at Kellogg. These locals were affiliated with the International Union of Mine, Mill, and Smelter Workers, initially organized at respondent's mine in 1934. After the failure at that time to induce respondent to bargain with the Union and the flat refusal of the company to have any negotiations with it, the Union became inactive until January, 1937, when a general campaign of organization was inaugurated in the district.

After a strike at the Morning and Page mines, the latter properties being near Kellogg and owned by the Federal Mining Company, the Union negotiated a written agreement with the company on behalf of the employees. Following this success the drive for membership in the Union was accelerated in respondent's mine.

The evidence of respondent discloses that its general manager, general foreman, mine foreman, shift bosses, and the supervisory staff, generally, were aware of the agitation going on, and knew that membership in the Union was increasing. They were all impressed with the prevalence of unrest, and at least one of these witnesses estimated that the sentiment favorable to a strike was better than ninety-five percent. The general foreman told the general manager "that regardless of anything else there was going to be a strike in the Sunshine", and Mr. Graham, the general foreman at the time, stated that, in his opinion, there were only two roads to follow: "One was to get rid of the known agitators; the other to sit tight and let the thing die out or come to a strike." While it is claimed that the manager suggested that nothing be done, it is significant that the foremen and bosses, with others, immediately took active steps to stop the Union.

When this agitation was at its height a group of employees, with the acquiescence of respondent's manager, met in an office furnished by respondent and adjacent to that of the manager, to consider a petition which had been prepared by Pete Johnson, a member of respondent's engineering staff, and Bud Batzle, who, in the absence of the regular foreman, was customarily in charge of respondent's sawmill. One of respondent's witnesses, who was concerned in preparing the document, testified that there were two copies of this petition circulated, that after the signatures were secured the copies were destroyed. There is some dispute as to the wording, but it appears to be conceded that the petition pledged the signers not to recognize any "labor holiday", "strike call", or "picket line" unless sanctioned by "a majority vote at a secret poll among all employees".

The evidence shows that on June 23 and 24, 1937, respondent's foremen and bosses actually participated in the circulation of the petition. They urged employees to read it; sometimes read it aloud to groups of workers; and in some instances persuaded employees to sign it.

The same group who had formulated and arranged for the circulation of the petition posted notices throughout the mine, announcing a vote by secret ballot, which read as follows:

### "Notice to All Employees

"There will be a secret ballot on the labor question at the Gunn Store from 3:00 to

5:00 p.m., June 24, 1937—(Today). Everyone please turn out as we want a 100 per cent vote.

"Employees Protective Association."

The ballot which was handed to the employees to vote was printed in the following form:

"Resolved:

"That we as Sunshine employees, want no outside interference in our relations with the Sunshine Mining Company, at this time.

"That we will not respect any labor holiday, strike, or picket line unless a majority of all of the Sunshine employees vote for it by secret ballot.

"If you agree with the above vote ( Yes )

"If you disagree with the above vote ( no )."

It will be observed that the ballot is skillfully worded so as to suggest adverse criticism of the Union, and the implication is plain that a "Yes" vote is desired.

It is not denied that general foreman Graham read a sample of this ballot to one of the assembled shifts at the mine, that he told them what the ballot stood for, urged them to think about it, but "to vote as they thought was right", and not to allow him to influence them. Foreman Becker testified, "I told everyone of my men to vote in that election." Foremen Angle and Benton and other supervisory officials all asked the employees to vote.

■ The respondent disclaims any responsibility for the circulation of the petition or for the conduct of the secret ballot. However, the evidence sustains the finding that the voting booths were made at the respondent's mill at its expense; that its foremen were active in urging employees to vote; that Graham, its general foreman, was present during the voting, as he says, "trying to see that it was fairly conducted", and respondent's timekeeper also was there to keep check of the employees as they voted. The "setup" had all the earmarks of "a campaign appeal and the opportunity to decide the issue campaigned about". Titan Metal Mfg. Co. v. National Labor Relations Board, 3 Cir., 106 F.2d 254, 260. There is substantial evidence to sustain the finding that, in conducting this vote, the respondent, through its foremen and supervisors, intimidated, interfered with, and coerced its employees in a manner inhibited by the Act.

■ This court has held that an employer may express his opinion as to the disadvantages of belonging to a union, and he might also state why he believes an employee would be better off if he did not belong to any union. National Labor Relations Board v. Union Pacific Stages, Inc., 9 Cir., 99 F.2d 153. But an employer may not, by word or conduct, coerce his employee or in any way obstruct his effort to organize his own union or interfere with his union activities in any way, and the employer is, further, forbidden to establish an employer-dominated union. The respondent here did not confine its activities to the accomplishment of things permitted, but definitely went beyond this and illegally interfered with its employees' activities, inspired the formation of its own company-dominated union, made use of unlawful methods of publicity to circumvent the efforts of the employees' union to bring their strike to a successful issue, and, finally, encouraged one of its foremen to form an unlawful group of so-called "Vigilantes", who drove the organizers of the Union out of the region and intimidated those who had gone out on strike.

While there is no direct testimony that the manager himself made any remarks derogatory to the Union, and while he testified that he did nothing himself to interfere with the Union's activities at the mine, nevertheless those who occupied supervisory positions immediately under him were not so circumspect. Many witnesses who were employees working in the mine testified to statements made by respondent's foremen, supervisors, and bosses, which clearly indicated a hostile attitude toward the Union. The general foreman told some of the employees that, in his opinion, the Union was a "racket" and that it was being conducted by "racketeers". The outside foreman said he did not like the C.I.O. and that the other bosses felt the same way. When the representatives of the Union came to negotiate with the manager, these antagonistic persons were called into the meeting.

Following the anti-union petition and ballot, respondent, still further anticipating the Union's endeavor to bargain, on June 26 posted on its bulletin board at the mine what it refers to as a "signed agreement" with its employees but which was nothing more than a declaration of company policy of indefinite duration, signed by no one but

general manager Leisk · and emphasizing that respondent would "bargain collectively only with groups or organizations of employees" and "only to the extent of their membership". This move, however, did not forestall the effort of the employees' bargaining committee to procure an agreement with respondent. On June 28 the bargaining committee, with McGuire, the Union's international representative, as spokesman, met with respondent's representative, manager Leisk, who brought in several foremen and two individual employees. McGuire presented a proposed agreement which had been approved by the Union. Leisk, after reading the proposed contract, said that any consideration of the paragraph providing for exclusive bargaining representation by the Union was contrary to respondent's labor policy which had been posted on June 26. The second conference between the parties on July 9 likewise ended in futility. At that meeting manager Leisk stated that the respondent did not consider itself subject to the provisions of the Wagner Act, that if it were determined that the company was, it would be bound by that and would then recognize the Union if it had a majority. He made it clear that he would not sign an agreement with the Union.

The conduct of the officials representing respondent was influenced to a considerable extent by the fact that the management had been advised by counsel that the corporation was not amenable to the Act and "that the National Labor Relations Board had no jurisdiction over the mining operations and business of the Sunshine Mining Company". This contention was made before the Board and has been made here, and, as we have heretofore pointed out, the assumption that the Act did not apply to the respondent was erroneous.

■ There was also a refusal to bargain on August 2, 1937. The evidence reveals a very definite determination not to comply with the provisions of the law. The letter of respondent's president to the Field Examiner of the National Labor Relations Board dated July 8, 1937, contains this statement:

"We are advised by our counsel that the National · Labor Relations Board has no jurisdiction over the mining operations and business of Sunshine Mining Company; that the National Labor Relations Act cannot be constitutionally applied to the mining operations of Sunshine Mining Com-

pany, and counsel further advises us that, in answering your letter we should expressly call attention to the fact that the Board has no jurisdiction.

"In view of that advice, we call attention to the fact the National Labor Relations Board has no jurisdiction over our mining operations, and we most respectfully reserve our jurisdiction and constitutional objections to any attempted supervision of our business and operations."

The letter from respondent's general manager to the same examiner dated July 24, 1937, among other matters, states: "As you know, the management of the company has been advised by counsel that the company is not subject to the jurisdiction of the National Labor Relations Board by reason of not being engaged in interstate commerce. This position is considered one of far reaching importance to the company in many matters quite unrelated to the specific question of the Board conducting the election in question. The management feels that it is in duty bound to preserve the constitutional rights of the company in this respect by declining to accept the suggestion of a consent election."

All of this confirms the findings that respondent had preconceived a determination not to enter into any agreement or bargain with the Union, which violated Section 8(5) of the Act. While it is true, as respondent insists, that the Act does not require an employer to reach an agreement, it does, as this court has held, "require sincere negotiations with the representatives of the employees". National Labor Relations Board v. Biles-Coleman Lumber Co., 9 Cir., 98 F.2d 18, 22.

Respondent's manager clearly indicated in what was said and what transpired at these various meetings that until it had first been determined that the company was subject to the Labor Relations Act, it would not enter into an agreement with the Union.

While the matters above set forth quite sufficiently demonstrate the refusal of respondent to bargain collectively with the Union, there was another attitude of opposition admittedly expressed by respondent that conclusively supports the finding of the Board. The Union presented a written agreement as a basis for discussion and bargaining. The manager at once declared that the directors of the company · "would not agree to enter into a signed agreement". Later this was confirmed in

788

a letter which recited that "After thorough consideration and discussion, the Board decided that it is not to the best interest of either the employees or the company to enter into this form of an agreement."

At the meeting of July 9, 1939, the manager emphasized this position of opposition by declaring that respondent would not become· a party to the written agreement, even "if 95 per cent of the employees were members of the Union."

In the brief and upon the oral argument it is contended that "the Act does not provide for a written contract" and that therefore the order in this respect is not enforceable.

The opinion of the United States Circuit Court of Appeals for the Second Circuit handed ·down February 26, 1940, in Art Metals Construction Co. v. National Labor Relations Board, 110 F.2d 148, answers the contention of respondent so aptly that we quote it here at length: "The argument on this point rests upon the admitted truth that the act does not force the parties to come to any agreement at all; for, although an employer must honestly negotiate with his employees collectively, that is as far as he need go. But if, the argument runs, he is forced to make it a term of any oral agreement that ·it shall be put into writing, he loses that absolute freedom in negotiation which he had at common law, and which Congress meant to preserve to him. Inland Steel Company v. National Labor Relations Board, 7 Cir., 109 F.2d 9. It is indeed true, and for that matter a truism, that a stipulation in an oral contract that it shall be put into writing is one of its terms, and that if an employer must put it in, he is not free pro tanto. But he is no longer wholly free anyway; before the act he was not obliged to bargain with his employees collectively; he was at liberty to refuse to negotiate with them at all, or otherwise than severally. The act impaired that freedom; it meant to give to the employees whatever advantage they would get from collective pressure upon their employer; and the question here is what are the fair implications of that grant. They should include whatever is reasonably appropriate to protect it, and no one can dispute that a permanent memorial of any negotiation which results in a bargain, is not only appropriate, but practically necessary, to its preservation; it is hardly necessary to observe that without it the fruits of the privilege are exposed to the sport of fugitive and biased recollection. The purpose of a contract is to define the promised performance, so that· when it becomes due, the parties may know the extent to which the promisor is bound; and it is the merest casuistry to argue that the promisor's freedom to contract includes the opportunity to put in jeopardy the ascertainment of what he has agreed to do, or indeed whether he has agreed to anything at all. The freedom reserved to the employer is freedom to refuse concessions in working conditions to his employees, and to exact concessions from them; it is not the freedom, once they have in fact agreed upon these conditions, to compromise the value of the whole proceeding, and probably make it nugatory."

■ The National Labor Relations Board was therefore warranted in "finding that this conduct on the part of respondent was a refusal to bargain collectively within the meaning of section 8(5)". National Labor Relations Board v. Biles-Coleman Lumber Co., 9 Cir., 98 F.2d 18, 22.

The Status of the Bargaining Unit.

The Board found that on June 28, July 9, and August 2, 1937, the respondent refused the request of the Union to bargain with it. Two of these instances took place before, while the third occurred after, the strike. The Board found that respondent's refusal was unlawful and caused the employees to resort to a strike to enforce their rights. We now examine the Board's finding that at the time respondent refused to bargain with the Union it represented a majority of the employees in a proper bargaining unit. ·

Respondent mistakenly, but possibly in good faith, yielded nothing to the claims of the Union. At the time the committee representing the Union announced that they represented a majority of the employees in the proper bargaining unit the manager would not concede the claim, but in order to follow the advice of its counsel and maintain its position that the National Labor Relations Act could not be constitutionally applied to respondent's dealings with its employees, the management objected to having the Board verify the claim of the Union by holding an election.

The opposition of respondent to have the National Labor Relations Act applied to any of its affairs is apparent throughout this case and reveals one of the important reasons why respondent declined to recog·

nize the Union and refused to bargain with it. At the hearing before the Board this dispute about the bargaining unit became the subject of energetic conflict, which has been strenuously continued before this court.

The complaint alleged that the mine and mill employees of respondent, excluding supervisory, clerical, and technical employees, constituted an appropriate unit for collective bargaining, and the Board so determined. The respondent contends that the appropriate unit should include office and technical employees; but, as the Board points out, there is a natural distinction between employees who are engaged in the production operations of respondent's mining and mill business and those who conduct its clerical and technical department. The respondent itself recognizes this distinction by carrying them on separate payrolls and paying for services rendered on a different basis. The clerical and technical employees receive a fixed salary while the other workers are paid on a daily or shift basis. That the managers, foremen, and supervisors were properly excluded from the unit should require no argument. The acts of the Board in specifying the appropriate unit was in no sense arbitrary or capricious, but manifestly rational. National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 105 F.2d 652; National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815; National Labor Relations Board v. Biles-Coleman Lumber Co., 9 Cir., 96 F.2d 197; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533.

This controversy about whether the Union bargaining committee represented a majority of respondent's employees occasioned extended argument. The figures are arranged and rearranged to reach a number of different results; exclusions are made in one place and inclusions in another. This is carried on through pages of the record and briefs. To follow the details here would burden this opinion to no good purpose. One or two examples relating to these differences will illustrate the character of the controversy. From the lists presented by the Union the foremen, mine-shift bosses, and clerical force are omitted. Respondent insists on including some of these on its list. The Union omits certain other persons who were not permanently employees of the respondent, among whom was a group re-

ferred to as "Boy Scouts". Respondent insists that these should be included, and in its brief asserts, "The deduction of 'Boy Scouts' is absolutely without foundation." The employees referred to were students who were given work in and about the mine temporarily during vacation. Indeed, while testifying, respondent's manager himself referred to them as "college students who were temporarily employed for a couple of months during the summer time", and respondent's timekeeper, when questioned concerning these youths—"Were they high school boys or young university students?"—answered, "I don't believe the—I believe that some of them were not even high school. Just kids." Suffice to say there was substantial evidence to sustain the finding of the Board that the Union represented a majority of respondent's employees as their bargaining unit.

Some argument is also made that these entire proceedings must fail because the document or agreement which was presented by the committee representing the bargaining unit made use of the expression "representative of all employees of the company", when, as a matter of fact, it is admitted that they did not represent the technical or clerical or managerial employees. The manager, of course, knew that this committee of the Union did not intend to represent those officials or clerical assistants that could not properly be included in the bargaining unit for which the committee sought to negotiate. Moreover, when the contract was presented, it was not suggested that this was a difficulty to the manager; he merely stated that he was not authorized to sign any contract. While announcing that he would negotiate, he also flatly refused to sign "any agreement". This offer to negotiate without ever negotiating was interpreted to mean that the management was merely stalling to delay any action by the committee until the company's union could be brought into existence and begin to function. The testimony of respondent's manager confirmed this conclusion. He said, " * * * we were willing to bargain collectively with the International Union as representing its own membership, and that we were always going to conform to the laws of the United States, which meant that if it was determined at any time that we were subject to the provisions of the Wagner Act that we, of course, would be bound by that, and if the Union had a majority, we were subject to the Wagner Act and we would

recognize the Union to the extent of its membership, and that that took care of the whole situation." And further, "We simply did not want to sign an agreement with the Union."

█ It is insisted in any event that a majority of the employees had not selected the Union as its bargaining agent. At the hearing the Union's membership books were checked against respondent's payroll; membership application cards were examined, and witnesses testified in reference thereto. Respondent produced as witnesses some employees who said that they had signed the cards and paid initiation fees for the sole purpose of voting against the strike. Some other employees testified that by signing the cards they had not intended to designate the Union as the representative for collective bargaining. As pointed out in the findings of the Board, the testimony of these witnesses given after the failure of the strike in which they had participated was not sufficient to overcome the effect to be given to their having previously joined the Union or signed the membership cards designating the Union as the bargaining unit. Besides their conduct and demeanor while testifying, there was other evidence tending to discredit these witnesses; they had been restored to their former positions with the company while others similarly situated were denied reemployment. As demonstrated by the Board, this discrimination was brought about through the intervention of certain individuals acting for or with respondent and who, at the time the testimony was given, were present confronting these witnesses. In view of all these circumstances we cannot say that the finding of the Board was not justified.

█ It should also be noted that respondent in its exception to the Intermediate Report did not question the Union's majority status on the grounds that certain of the application cards were not properly signed or the signatures properly identified or that certain cards were insufficient to show that the signer had designated the Union as his bargaining representative. This failure to inform the Board at the proper time that the matters would be drawn in question now precludes the claim here. National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 653, 662. Besides, the contention is without merit.

While the Union was taking a strike vote, the group of employees who had theretofore engineered the signing of the petition and the taking of the ballot opposing a strike called other meetings, which took place in a boarding house on respondent's premises. The purpose of these meetings was to crush the strike and obstruct any further union activities. Such a meeting was held on August 1, 1937, the date that announcement was made that the Union strike vote had carried. Much of the meeting was devoted to addresses designed to dissuade the employees from lending any support to the strike. One of the principal speakers was a person unknown to the employees, who was introduced by the general foreman, Graham, who also addressed the meeting. Among those in attendance were at least half a dozen of respondent's supervisory staff. The general manager was seen near the entrance of the building. Methods for overcoming the strike were considered and their execution entrusted to Best, Higgins, and Kulm, who had already assumed active leadership of the movement opposing the Union and who were known as the active agents of the "Committee of 356". Hereafter these three may be referred to as the committee.

The president and manager of respondent, empowered so to do by resolution of its board of directors, turned over the operation of the mine to this committee. Immediately they were joined by a man they designated as "Jones", from Seattle, whom they had never known before but who was introduced "on the steps of the Sunshine office" by some unremembered person. However, Jones knew respondent's president and manager, and was around the mine "quite often". Assisted by this expert the committee launched a publicity campaign "to influence public opinion and break down the morale of the strikers and pickets". They made use of all the modern methods to effectuate their purpose including paid newspaper advertisements, mimeographed bulletins, and press releases—all drafted or edited by Jones. Respondent's board of directors room was used as a place of conference. The committee disclaimed any knowledge as to who was to pay Jones for his services but took for granted that he was being remunerated. Nor did the committee know who paid for all the printing and advertising. The committee had no funds. The Board found as "a fair inference that the respondent financed the

publicity campaign and employed and paid Jones for his services".

On the eve of the strike high supervisory officials requested the county sheriff to deputize a considerable number of "loyal" employees. The sheriff declined to accede to this demand.

There was testimony that at times one or more of the pickets used language that might provoke an assault. Such an instance was testified to by one of respondent's employees who, before the strike, had been named by the sheriff as a deputy without pay. Yet this man did not make any arrests, but complained to the sheriff and demanded that he make the arrests, but as these alleged offenses had not been committed in the presence of the sheriff, he insisted that the complainant swear to a complaint so that a warrant might regularly issue; the employee deputy refused to follow this regular procedure. Instead, representations were made and pressure was put upon the Governor in a vain attempt to have martial law declared and the military forces of the State of Idaho ordered to the scene of the strike.

A great number of telegrams were sent to the Governor; many of the originals filed in the transmission office are in the same handwriting, except the names, which were signed by employees who had remained at work. Included were messages from various of respondent's supervisors. The evidence shows that most of these telegrams were not paid for by the persons who signed them. By reason of the foregoing facts and other circumstances appearing in the evidence and not developed here, we agree with the finding of the Board that it was reasonable to infer "that respondent paid for and sent these telegrams in an effort to obtain a show of military force in order to break the strike".

On August 4 there was inserted in the local newspapers an ultimatum to respondent's employees who had not joined the picket line but who had ceased to work, fixing August 5 as the deadline for their return to work. The notice was signed for the "Committee of 356" by the three employees who had been given full authority by respondent to operate the mine. This trio reinstated whom they would, assigned different men to different jobs, rearranged shifts, and exercised the complete authority over the mine vested in them by respondent during the strike period.

John Kitkowski, a departmental head, answerable only to respondent's president and general manager, sent a message to the Governor, which, as originally written by him, read: "Send protection and clear pickets for workmen are organizing an army and intend to finish the C.I.O." The message as filed was skillfully altered to read, "Send protection for workmen", but Kitkowski did not change his purpose to end the strike.

To effectuate this plan Kitkowski and Best of the "Committee of 356" arranged for a mass demonstration. As Best testified, they got in touch with "a fellow up there that runs a beer joint" who "said he would get in contact with a lot of men". Their "suggestions were * * * that McGuire ought to be tarred and feathered, and his lieutenants with him, and run out of the Coeur d'Alenes and possibly hang him." Kitkowski had printed and caused to be widely circulated 10,000 handbills giving notice that at 8 o'clock Monday morning McGuire would have to face 1,500 men. If McGuire showed up, a resolution was to be voted and he was to be run out of the country, and, as the handbill declared, if he "does not appear the strike will be considered lost".

On the day before this mass meeting was to take place State Law Enforcement Officer Balderson notified McGuire and the Union committee that he could not stop this demonstration, that there was going to be bloodshed, that the thing to do was to withdraw the picket line, for all the pickets to go to their homes, and for McGuire and Peoples to leave the county before midnight. McGuire left; the pickets were scattered; the strike collapsed.

With the picket lines dispersed the demonstration of force was transformed into a victory parade which was addressed by respondent's general manager, general foreman, and by Best of the "Committee of 356". Respondent furnished free transportation for the demonstrators and distributed "beer tickets", holders of which could get free drinks. During this victory parade some of the participants went to the headquarters of the Union and carried away the C.I.O. sign.

While this celebration was in progress a number of marchers, being accompanied by one of respondent's shift bosses, went to the home of one of the employees who went out on strike and who belonged to the

Union, and threatened that if he did not get out of town, they would kill him. He left the State at once.

The following is an excerpt from a joint message sent to a company director that day by respondent's president and general manager: "Strike over. McGuire gone. Pickets dispersed. This is a complete and unconditional surrender without any commitment whatever on part of company. * * * This is probably the most decisive defeat C.I.O. has suffered."

The Board found that respondent participated in these acts of intimidation and violence; that the demonstration was definitely anti-union and violated Section 8(1) of the Act. The evidence sustains the finding.

This John Kitkowski also formed and directed a vigilante organization to prevent the labor Union from organizing the miners and to break the C.I.O. The evidence discloses a number of instances of intimidation. Men active in the Union were frightened and left the country.

An employer is responsible for the activity of supervisors and foremen in interfering with employees' rights. National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951; Virginia Ferry Corp. v. National Labor Relations Board, 4 Cir., 101 F.2d 103; National Labor Relations Board v. Planters Mfg. Co., 4 Cir., 105 F.2d 750; Swift Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87.

During the time Best, Higgins, and Kulm of the "Committee of 356" were exercising full managerial control of respondent's mining operations they were instrumental in forming the Big Creek Industrial Union. They were the incorporators and selected the directors and chose the first officers. One of the chief purposes for which it was organized was to combat the C.I.O. The Big Creek Union never functioned as a bargaining agency. There was ample evidence to sustain a finding that respondent had engaged in unfair labor practices by active participation in the organization and administration and in dominating the activities of this company union. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 268, 58 S.Ct. 571, 82 L.Ed. 831, 115 A. L.R. 307; National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838; National Labor Relations Board v. Carlisle Lumber Co.,

9 Cir., 99 F.2d 533; National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 96 F.2d 193; National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167.

After the picket line had been dispersed Best, Higgins, and Kulm, under the complete authority vested in them by respondent, required that those employees who had gone on strike, but had not joined the picket line and wished to be reinstated in their former employment, should make application to them. Applicants were interviewed by this committee in the directors room of respondent. A number of those who had served as pickets applied for reinstatement without success. It was clearly indicated that there was "No job for a C.I.O.", which ultimatum embraced practically all of the strikers.

As an excuse for refusing to employ those who had engaged in picketing, respondent asserts that those who had remained at work would not work with them on account of the antagonism that existed between the two groups. This attitude of the respondent's non-union employees was encouraged by its agents and supervisory officials, and brought on by them. The conduct of respondent brought on the strike and it must be held responsible for what followed. Clover Fork Coal Co. v. National Labor Relations Board, 6 Cir., 97 F.2d 331. It is quite apparent that the real reason the picketing strikers were denied reinstatement in employment was because of their union activities.

As the actual effect of respondent's conduct was to discharge those employees, the circumstances dispensed with the necessity of application for reinstatement. National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533.

The court is in agreement with and sustains the findings and conclusions of the Board and directs that its order stand with the modification hereinafter indicated.

The order of the Board, division 2, paragraph (c), reads as follows: "(c) Upon request, bargain collectively with International Union of Mine, Mill and Smelter Workers as the exclusive representative of its mine and mill employees, excluding clerical, supervisory and technical employees, in respect to rates of pay, wages, hours of employment, and other conditions of employment, and, if an understanding is

reached in any such matters, embody said understanding in a written signed agreement for a definite term, to be agreed upon, if requested to do so by said International Union of Mine, Mill and Smelter Workers;"

The opening brief for the Board filed in this court says: "The Board requests and consents to the elimination from this latter provision of the order of the words 'for a definite term to be agreed upon'." This request is granted and the order of the Board is so modified.

A decree enforcing the order as modified will be entered herein.

HANEY, Circuit Judge (concurring).

I concur in the result found in the majority opinion, and in the reasoning thereof, except as follows:

*First.* I think the Board had jurisdiction on the ground that an unfair labor practice by respondent might lead to a strike which would have an injurious effect on interstate commerce, and therefore the Board could properly remove the cause of such "effect". Whether respondent's activities were in interstate commerce, or were a "flow" of such commerce, I think it unnecessary to decide. National Labor Board v. Jones & Laughlin, 301 U.S. 1, 36, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

*Second.* I think the question as to whether or not a refusal to reduce an agreement to writing is an unfair labor practice, is not before us, and I express no opinion in that respect. Respondent engaged in unfair labor practices and the Board so found. The Board had the power to issue an order compelling respondent "to take such affirmative action * * * as will effectuate the policies of" the act. 29 U.S.C.A. § 160(c). In my opinion the Board could properly order respondent to embody any understandings reached in a written contract, in the exercise of such "affirmative action".

*Third.* The Board found that respondent refused to bargain with the representatives of a smaller unit than the one claimed by such representatives. For the reasons expressed in my dissenting opinion in National Labor Relations Bd. v. National Motor B. Co., 9 Cir., 105 F.2d 652, 666, I think the Board had no power to find that respondent committed an unfair labor practice by refusing to bargain with representatives of a unit of lesser number than the one claimed by the union. However, I recognize that the cited case is binding on me, and therefore concur with the holding in this case.

*Fourth.* Parts of the Board's order herein require respondent to cease and desist from "in any manner" reaching a prohibited result. I think such words should be stricken from the order, for the reasons expressed in National Labor Relations Bd. v. National Motor B. Co., supra, 105 F.2d at pages 663-664. However as that case is binding on me, I concur in the enforcement of the order herein.

STEPHENS, Circuit Judge (concurring)

I concur in the result reached by Judge GARRECHT, and in his opinion with the single exception that I concur in Judge HANEY'S point marked "Second" in his concurring opinion.