## NATIONAL LABOR RELATIONS BOARD v. PACIFIC GAS & ELECTRIC CO.

No. 9424.

Circuit Court of Appeals, Ninth Circuit.

March 28, 1941.

Rehearing Denied May 13, 1941.

Charles Fahy, Robert B. Watts, Laurence A. Knapp, Bertram Edises, William F. Guffey, Jr., and Gerhard P. Van Arkel, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Thos. J. Straub, John C. Wood, and Stephen R. Duhring, all of San Francisco, Cal., and J. Paul St. Sure, of Oakland, Cal., for respondent.

Jay L. Henry and Grover W. Bedeau, both of Sacramento, Cal., for intervener.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order issued against respondent, and the latter seeks to have the order set aside.

In 1933, the Utility Gas and Electric Employees of California, a non-profit corporation, was organized as an independent labor organization, membership in which was limited to respondent's employees. In April, 1937, that organization became a part of the United Electrical & Radio Workers of America, a labor organization affiliated with the Congress for Industrial Organization, which organization is hereafter called "United". United claims jurisdiction over employees in the whole of the electrical and radio industry. Ten locals of District 14 of United cover the geographical area served by respondent, the membership of which locals is composed solely of respondent's employees.

On May 1, 1937, the California Gas and Electric Employees Union, a labor organization, hereafter called the "California Union" was incorporated under the laws of California, the membership in which was limited to respondent's employees.

International Brotherhood of Electrical Workers, a labor organization affiliated with the American Federation of Labor, (hereafter called the "Brotherhood"), also claimed membership of some of respondent's employees.

The Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local Division 256, a labor organization affiliated with the American Federation of Labor, hereafter called "Amalgamated", also claimed membership of some of respondent's employees.

On May 19, 1937, United filed with the Board a petition alleging that a question affecting commerce had arisen concerning the representation of respondent's employees, and requesting an investigation and certification of representatives pursuant to § 9(c) of the National Labor Relations Act, 29 U.S.C.A. § 159(c). On June 26, 1937, the Board authorized an investigation. On October 16, 1937, the Board made its decision directing an election to be held within 60 days to determine whether the employees in a particular unit specified desired to be represented by United, the California Union, or the Brotherhood, and also directed an election to be held to determine whether the employees engaged in the operation of the street car and motor bus system in Sacramento, California, desired to be represented by Amalgamated, United, the California Union, or the Brotherhood. 3 N.L.R.B. 835. On November 5, 1937, the Brotherhood requested the Board to withdraw its name from the ballot in the elections, which request the Board granted on November 20, 1937. 4 N.L.R.B. 180.

Election by secret ballot was conducted during the period from December 6, 1937, to December 14, 1937. On December 21, 1937, an intermediate report was issued by a regional director of the National Labor Relations Board, showing the following results:

| | |
|---|---:|
| Number of votes for the California Union | 3,550 |
| Number of votes for United | 2,254 |
| Number of challenged votes | 982 |
| Number of votes for neither union mentioned | 126 |
| Number of void ballots | 10 |
| Total ballots counted | 5,930 |

On December 20, 1937, United filed a charge with the Board alleging that respondent had engaged in and was engaging in unfair labor practices.

On December 21, 1937, United filed objections to the intermediate report above mentioned regarding the results of the election, and later supplemented them. In effect it was alleged that the election was unfair and not free because employees

were coerced by respondent to vote for the California Union.

On August 12, 1938, the Board ordered the representation case and the unfair labor practice case to be consolidated for hearing. In the meantime several amended charges had been filed by United, and the complaint was not issued until August 13, 1938.

The complaint alleged violation by respondent of § 8(1) of the act, 29 U.S.C.A. § 158(1) "by various and sundry acts, including, but without limitation, the following": (a) by making known to its employees its disapproval of and hostility to United; (b) by making known to such employees its opposition to membership in or assistance to United; (c) by making known to such employees its preference for some labor organization as the representative of its employees for the purposes of collective bargaining, other than United or any other national labor organization; (d) by making known to such employees its approval of and friendliness toward California Gas and Electric Employees Union, an independent union, herein called the California Union, and its preference thereof as a representative of its employees for the purpose of collective bargaining; (e) by lending advice, assistance and counsel to certain of its employees in the formation and organization of the California Union; (f) by engaging in or acquiescing in or approving the solicitation of members for the California Union, among its employees on company property, during company time, or with the use of company equipment and facilities; and (g) by sponsoring, assisting or instigating meetings of its employees for the purpose, in whole or in part, of influencing said employees to join or assist the California Union and not to join or assist United.

On August 20, 1938, respondent, United and the Board stipulated that the record of the proceedings in the representation case should be considered as a part of the record in the consolidated hearing. On August 26, 1938, respondent filed an answer denying that it had engaged in or was engaging in any unfair labor practice. As a further defense, respondent alleged that the Board lacked jurisdiction of the proceeding because the unfair labor practices are not shown to affect commerce as defined in the act. For a further defense, respondent alleged that if any of the acts alleged in the complaint were held to be unfair labor practices, then the act abridged the right of free speech contrary to the first amendment of the Constitution.[1] On the same day, respondent filed: a motion for a bill of particulars; a motion to dismiss the proceedings; a motion to strike certain allegations of the complaint; and a motion to make the complaint more definite and certain.

Hearings before a trial examiner commenced on August 29, 1938. The trial examiner denied the motions above mentioned and granted the request of the California Union to intervene. Hearings were held on August 29 and 31, and on September 1, 2, 6, 7, 8, 12, 13 and 14, 1938.

During the hearings and on September 12, 1938, respondent's counsel requested that the records of the Labor Board in connection with the election be produced. The trial examiner replied that such an application must be made "in formal form by way of an application or a petition". Counsel thereupon filed an application for issuance of a subpoena requiring attendance of the Regional Director with the following documents: the intermediate report on the election; list of respondent's employees within the unit found to be appropriate and eligible to vote; list of employees whose votes were not challenged; list of employees whose votes were challenged together with the record of the reasons specified as bases for challenge; and all affidavits made by the Board's agents and by representatives of the unions named on the official ballot who acted as judges, observers or in other official capacity in connection with the conduct of the election. The application stated that such documents would tend to prove that respondent was not responsible for the acts of various "supervisory" employees in organizing the California Union, that the acts of such employees did not amount to interference or coercion, that the conduct of the election was regular, and that the election reflected the "free, true, independent and uncoerced choice" of the employees who voted. The application was denied.

Thereafter by stipulation, respondent obtained the desired information regarding all employees who had been referred to by the Board's witnesses in their testimony. Respondent did not obtain like information regarding the employees whose conduct

---

[1] This defense is not urged before us.

had not been mentioned by the Board's witnesses, the affidavits of the representatives of the Board and the unions, or the intermediate report on the ballot.

The trial examiner issued his intermediate report in the consolidated hearings on October 25, 1938. Both respondent and the California Union filed exceptions to such report. Oral argument was held before the Board on January 12, 1939. Only respondent appeared and presented an argument. The Board made its decision and order on June 14, 1939.

The Board held that the denials of the motion for a bill of particulars, the motion to strike and the motion to make the complaint more definite and certain, were not prejudicial to respondent. It further held that the denial of the application for the subpoena mentioned was not prejudicial, because of the information received by respondent pursuant to the stipulation, and because the affidavits and intermediate report were already a part of the record. It further stated that the affidavits "were immaterial because no claim was ever made of irregularity at the polls with which subject alone the affidavits deal".

The Board found facts from which it concluded that the unfair labor practice charged might affect commerce as defined in the act. It discussed specific acts of certain supervisory employees of respondent and concluded as follows: " * * * that the respondent from April through December 1937 by the numerous statements and warnings of its supervisory employees in favor of the California Union and against the U.E.R.W., by its assistance to the California Union's campaign of organizing locals, by allowing meetings favorable to the California Union and opposing the U.E.R.W. to be held on company time and property, by solicitation of members for the California Union, by active assistance to the California Union in the bank loan transactions above mentioned, and by the other acts set forth above, has interfered with, restrained, and coerced its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of col-

lective bargaining and other mutual aid and protection as guaranteed in Section 7 of the Act [29 U.S.C.A. § 157]."

It ordered respondent to "Cease and desist from in any manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act;"

The Board also held the election void, and ordered a new election to be held on a date to be fixed subsequently when the Board would be "satisfied that the effects of the respondent's unfair labor practices have been dissipated sufficiently to permit a free choice of representatives".

On January 20, 1940, the Board filed in this court its petition to enforce its order. On April 14, 1940, respondent answered and petitioned this court to set the order aside. The Board filed its brief on May 20, 1940, the respondent filed its brief on July 3, 1940, and the California Union filed its brief on July 15, 1940. The cause was set for hearing, pursuant to our rule 4(2),[2] before three of the seven judges of this court. The cause was argued and submitted on the day fixed—August 7, 1940. Such judges were not able to agree on a disposition of the case and on December 3, 1940, entered an order as follows: "The submission heretofore ordered is hereby set aside and the case ordered reargued". On December 21, 1940, the Senior Circuit Judge made an order as follows: "It Is Ordered that the reargument of above cause be, and hereby is calendared for hearing on Thursday, January 23, 1941, at San Francisco, California, at 10:00 o'clock a.m. before Garrecht, Haney and Stephens, Circuit Judges". None of the judges mentioned participated in the first hearing of the cause. Oral arguments of the Board, respondent and the California Union were heard on the date fixed by the judges mentioned in the order of December 21, 1940, i.e., on January 23, 1941.

▉ Before discussing the contentions in detail, we mention that the brief of the California Union concluded with the state-

---

[2] "The Senior Circuit Judge after conference with the Circuit Judges shall designate and assign the judges who are to hear the causes placed upon the calendars of the Court; such designation or assignment may be modified or set aside by a majority of the judges."

ment that the findings of the Board were not supported by substantial evidence, and the order should be set aside. On oral argument, however, that union stated that it was immaterial to such union whether we enforced or set aside the order. Upon the statement thus made, we will disregard the brief of the California Union.

### Jurisdiction of the Board.

The Board found that respondent is engaged in the business (a) of generating, buying, transmitting, selling and distributing electric energy; (b) of buying, transporting, selling and distributing natural gas; and (c) of manufacturing, transporting, selling, and distributing manufactured gas, entirely within the northern and central portions of California. Respondent and its subsidiaries operate 49 hydro-electric and 10 steam electric generating plants in California. Of the total output of kilowatt hours of respondent and its subsidiaries, about 74 per cent is generated by hydro-electric plants, about 4.9 per cent by steam plants, and about 21.1 per cent is purchased from other producers.

The Board found that the "evidence specifically discloses the following effects on the operation of instrumentalities of interstate and foreign commerce and communication in the event of the cessation or curtailment of the flow of power from the respondent, such as would tend to accompany industrial strife between the respondent and its employees" and specifies them numerically. Summarized these are that a cessation of the flow of power from respondent: (1) would seriously handicap and imperil navigation in and out of San Francisco Bay and along the coast of central and northern California because the stand-by lights which would be utilized in such an event, in the place of those operated by respondent's electricity, are not sufficiently powerful for the efficient and safe guidance of navigation; (2) would be disastrous to navigation in San Francisco harbor and would completely shut down all operations on the piers and docks; (3) would immediately handicap the operation of signalling systems, and in the case of a cessation for 2 weeks, would exhaust the reserve power stored in the batteries and thereafter there would be a complete shut-down of all train movements in the area served by the respondent; (4) would seriously disrupt and perhaps completely stop the transmission of interstate messages, as the stand-by power plants of the telegraph companies are inadequate and designed for use only in short-lived emergencies; (5) would result in the cessation of all telephone communication, including interstate communication; and (6) would stop all radio broadcasting in California, and from California into other states within 18 hours.

The Board also made findings with respect to a large number of manufacturing and other industries, which findings need not be related.

As can be seen, all the findings of the Board as to the effects are based on the assumption that a strike would cut off the supply of electricity. Respondent contends that the record does not support such an assumption, and points to the following testimony of Robert E. Shippey, a United representative:

"Q. (By Mr. Jennings). Would a sit-down strike in the substations paralyze the activities of the Pacific Gas and Electric Company? A. If the men pull the switches it would.

"Q. Would they have the ability to pull the switches? A. That is what they are there for; yes.

"Q. May I ask you again, in the light of the testimony which you have given, if your union should call a strike, what would be the effect upon the ability of the Pacific Gas and Electric Company to furnish light and power to its customers? A. They wouldn't be able to furnish light and power to their customers at that time.

"Q. In other words, it would completely paralyze their activity? A. Their system; yes.".

Respondent contends that the only conclusion which can be drawn from such testimony is that there would be no cessation in the flow of electric energy "unless striking employees engaged in a sit-down strike and pulled the switches in the substations" which acts are unlawful in California (Penal Code of California, §§ 418, 593), and since it must be presumed that people will obey the law, there is no ground to assume that the flow of electricity would cease.

While novel, we think the argument cannot prevail. We think a reasonable man could infer that respondent itself would pull the switches. Respondent is not an eleemosynary corporation. It is reasonable to assume that the immense number of employees are necessary in order

to supply electric energy, or respondent would not retain them. It would naturally follow that if such employees went on strike, respondent would not prudently permit operation of its system in their absence, even were it possible to do so. We think the Board could rightfully infer that a strike would cause a cessation of the flow of electricity.

Respondent further contends that it was incumbent on the Board "* * * to show that commerce would be directly and substantially affected by a labor dispute between respondent and its employees. It was incumbent on it to show not merely that the instrumentalities of commerce would be inconvenienced but was required to show that commerce would be substantially affected thereby. It was not enough to show that production enterprises engaged in commerce would be affected because production is essentially a local enterprise and the effects of such labor dispute would only indirectly affect commerce * * *"

It is said that the record discloses that the instrumentalities of commerce would be inconvenienced only, and that regarding the manufacturing and other industries, they are engaged in production only, and the effect on commerce of labor strife as to such industries would be indirect and remote only.

■ It is unnecessary to discuss the subject at great length. Congress has power not only to protect, regulate and control interstate and foreign commerce, the instrumentalities thereof, as well as interruptions and injuries of such commerce and instrumentalities, but also burdens and obstructions which directly affect such commerce. National Relations Labor Board v. Jones & Laughlin Corp., 301 U. S. 1, 31, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Co. v. Labor Board, 303 U.S. 453, 464, 58 S.Ct. 656, 82 L.Ed. 954. Regarding such effect is the following from Santa Cruz Co. v. Labor Board, supra, 303 U.S. page 466, 58 S.Ct. page 660, 82 L.Ed. 954:

"* * * where federal control is sought to be exercised over activities which separately considered are intrastate, it must appear that there is a close and substantial relation to inter-state commerce. * * *

"To express this essential distinction, 'direct' has been contrasted with 'indirect,' and what is 'remote' or 'distant' with what is 'close and substantial.' Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. * * *"

A more understandable rule would be that Congress has the power to regulate and control interstate and foreign commerce, the instrumentalities thereof, and whatever may be the proximate cause of an interruption, burden, obstruction or injury thereto. However, that subject need not be pursued here, because the Board's findings that instrumentalities of commerce might be interrupted must be sustained.

■ It is unnecessary to discuss all the findings regarding the interruption of instrumentalities of commerce, because if any of them is sustained by substantial evidence, the Board clearly has jurisdiction.

■ There was testimony that in the majority of cases on the Pacific Coast, the broadcasting stations did not have a stand-by plant available to operate the stations upon a cessation of electric energy; that in the "Bay Area" all the stations, with possibly one exception, would have to shut down. It is clear that a radio station is an instrumentality of interstate commerce. Therefore, the Board has jurisdiction. The fact that such stations could put in their own plants to supply electric energy, is immaterial, because the fact is that they have not done so. See, also, Edison Co. v. Labor Board, 305 U. S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

### The Unfair Labor Practice.

The statements made by what the Board calls "supervisory" employees, were made by three different classes, i. e., job foremen, general foremen, and division superintendents. Respondent's first contention is that it is not bound by the acts of such employees because there was nothing to show it had authorized any of such individuals to make the statements.

It appeared that of the three classes of employees above mentioned, only the division superintendent has the right to hire and fire employees. The right is not unlimited however. If the employee discharged was guilty of intoxication on the job, gross insubordination or dishonesty, the division superintendent would have the right to make the discharge. In other cases, where the employee had more than five years of service with respondent, the discharge would have to be made by respondent's personnel department. The job foreman may administer some reprimands,

report on the performance of men working under him, and make recommendations regarding discharge of such men, which recommendations are given consideration by respondent. The general foremen are directly in charge of the job foremen and may discipline the employees.

The question involved here has been discussed by the Supreme Court. In International Ass'n of Machinists etc. v. Nat'l Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 88, 85 L.Ed. ——, November 12, 1940, the court said: "The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of respondeat superior. We are dealing here not with private rights (Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738) nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. Thus where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates. Here there was ample evidence to support that inference. As we have said, Fouts, Shock, Dininger and Bolander all had men working under them. To be sure, they were not high in the factory hierarchy and apparently did not have the power to hire or to fire. But they did exercise general authority over the employees and were in a strategic position to translate to their subordinates the policies and desires of the management. * * *"

In National Labor Relations Board v. Link-Belt Co., 61 S.Ct. 358, 366, 85 L.Ed. ——, January 6, 1941, the court said: "* * * Nor does the Board lack the power to give weight to the activities of some of the supervisory employees on behalf of Independent, even though they did not have the power to hire or to fire. As we indicated in International Association of Machinists v. National Labor Relations Board, supra, the strict rules of respondeat superior are not applicable to such a situation. If the words or deeds of the supervisory employees, taken in their setting, were reasonably likely to have restrained the employees' choice and if the employer may fairly be said to have been responsible for them, they are a proper basis for the conclusion that the employer did interfere. * * * Here such inferences were wholly justified. The attitude of the employer towards an 'outside' organization was clearly conveyed. When that was followed by solicitation for Independent on the part of supervisors who had general authority over the men, it would be unfair to conclude that the employees did not feel an actual pressure from the management. That fact, the failure of the employer to announce its impartiality, its delay in advising the supervisors to remain neutral until Independent had acquired its majority, the favors shown Independent, the discharge of Salmons and Novak, its past union policy, all are part of the imponderables which the Board was entitled to appraise. The fact that these various forces at work were subtle rather than direct does not mean that they were nonetheless effective. Intimations of an employer's preference, though subtle, may be as potent as outright threats of discharge."

See, also, Heinz Co. v. National Labor Relations Board, 61 S.Ct. 320, 85 L.Ed. ——, January 6, 1941.

From the foregoing, it appears that if a reasonable man, in the position of an employee, could conclude or infer that the acts and deeds of the supervisory officials represented the attitude of the employer, then the Board may find that such acts and deeds were the acts and deeds of the employer. In determining whether such a reasonable man could make such an inference, the Board may consider a number of factors, some of which are: the actual authority of the supervisory employees and whether "they were in a strategic position to translate to their subordinates the policies and desires of the management"; the employee's previous union attitude; favoritism of the employer; and failure of the employer, upon being informed of the acts and deeds of the supervisory officials, to renounce such acts and deeds and to announce its impartiality. It is unnecessary that all factors be present

in each case, for one or more may be sufficient to authorize the inference. For that reason, respondent's attempt to distinguish the above cases on the ground that there is here no showing of a past history of antagonism to unions by respondent, is immaterial.

The Board found that "the important consideration is that the various supervisory employees whose actions are in question did in fact hold positions with the respondent which gave them certain powers of direction over other employees, who identify them with the management". Respondent does not challenge that finding. Under the circumstances, the Board could and properly did hold respondent responsible for the acts and deeds of the supervisory employees.

Respondent further contends that the findings of the Board are not supported by substantial evidence in that the statements made by the supervisory employees were not such as to constitute interference, restraint, or coercion. It is not necessary to consider all statements made. It is sufficient if any of them meet the tests prescribed. Of course, if none of the statements made could constitute interference, restraint or coercion of the employees, then respondent has not been guilty of any unfair labor practice.

The findings of the Board must be sustained if there is any substantial evidence in the record. Edison Co. v. Labor Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Columbian Co., 306 U.S. 292, 299, 59 S.Ct. 501, 83 L.Ed. 660. Substantial evidence requires more than a scintilla of evidence. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". Edison Co. v. Labor Board, supra, 305 U.S. 229, 59 S.Ct. 217, 83 L.Ed. 126. In determining the question raised by respondent, we must decide whether an ordinary man could reasonably conclude that the statements made interfered with, restrained or coerced the employees in the exercise of the rights guaranteed them by the act.

Thiele, a job foreman, told certain of respondent's employees "that if the C.I.O. won they would be about 20 men out of a job in that department" in referring to the impending election. Egan, another job foreman, told two employees that he (Egan) understood that if the vote went the wrong way, respondent was going to contract out all their work. Woodward, a general foreman, told an employee in the gas department that if the respondent had any trouble with the C.I.O., it would contract its work out. These are a few of the statements referred to by the Board.

Respondent argues that these statements were made by men eligible for membership in the various unions and merely made the statements in their own interests in order to obtain members for the particular union of their choice. While we think a reasonable man could reach that conclusion, we also believe that a reasonable man could conclude, as the Board did, that such statements interfered with the rights of respondent's employees. The Board made the latter inference. We are powerless to change it. National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396, and cases cited; National Labor Relations Board v. Waterman S. S. Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 343, 60 S.Ct. 918, 84 L.Ed. 1226; National Labor Relations Board v. Link-Belt Co., 61 S.Ct. 358, 365, 85 L.Ed. ——, January 6, 1941. "Congress entrusted the Board, not the courts, with the power to draw inferences from the facts." National Labor Relations Board v. Link-Belt Co., supra.

### The Hearing.

Respondent contends it was not accorded a fair hearing because the complaint did not contain the names of the individuals involved or the time and place or occurrences of the acts alleged to constitute the unfair labor practices, and the Board declined to grant the various motions calculated to elicit such information. Section 10(b) of the act, 29 U.S.C.A. § 160(b), provides: "Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board * * * shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect * * *."

We think that the statute means that the complaint must state only the manner by which respondent had engaged in or was engaging in unfair labor practices, and which of such practices is in question. The complaint here meets that test.

There is a suggestion that the complaint violates the Board's rules (§ 4

(e) of Art. II), but we assume that since the Board has power to make the rules it has power to suspend them.

■ Respondent further contends that a fair hearing was not afforded because of the refusal of the trial examiner to have the records regarding the election produced. Since the election is not here involved, no decision need be made in that regard. However, we do not wish to be understood as approving the action of the trial examiner. If, as the Board said, such records were a part of the record in the consolidated cause, respondent certainly was entitled to know what was in such record, and the autocratic action of the trial examiner was indefensible.

### The Order.

■ Respondent contends that enforcement of the order should be denied because it is not charged or contended that the conduct complained of continued after December, 1937. It is said that equity will not enjoin completed transactions, and since there was no threat or impending danger of the recurrence of the acts, there was no case or controversy within the meaning of § 2, of Art. III, of the Constitution. We think both contentions are answered by the statement that it "is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged". International Ass'n of Machinists, etc., v. Nat'l Labor Relations Board, supra. See, also, National Labor Relations Board v. Link-Belt Co., supra.

■ Finally, it is contended that the words of the order compelling respondent to cease and desist "from in any manner" engaging in the unfair labor practice mentioned, means that in the future it must live under an injunction and must be tried not by the Board for any alleged unfair labor practices but by this court for violating the injunction, and that it is restrained from committing any acts whether like or unlike the acts referred to in the record.

This court was the first to specifically consider and discuss this contention, and held (one judge dissenting) that it was without merit. National Labor Relations Board v. National Motor B. Co., 9 Cir., 105 F.2d 652, 660. Since submission of the cause, the Supreme Court has decided National Labor Relations Board v. Express Publishing Company, 61 S.Ct. 693, 697, 85 L.Ed. —, March 3, 1941. In that case,

the Board found that respondent had not negotiated in good faith, and that it had made certain statements which interfered with the union's effort to negotiate with respondent. The Board concluded that respondent had violated § 8(1) and (5) of the act. The Board's order commanded respondent to bargain collectively, to cease and desist from refusing to bargain, and to cease and desist from "in any manner interfering with, restraining, or coercing its employees in the exercise of their rights" guaranteed in § 7. The court held that the order should be modified as to order respondent to cease and desist from "In any manner interfering with the efforts of the Guild to bargain collectively with" respondent.

While the language of that opinion is not free from doubt, we think it requires modification of the Board's order by striking therefrom the following language: "to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection". The interference here related to the "right to self-organization, to form, join, or assist labor organizations" and nothing else.

The order is modified as above stated, and as so modified is enforced.

GARRECHT, Circuit Judge (concurring specially).

I concur with Judge STEPHENS' analysis of National Labor Relations Board v. Express Publishing Company, 61 S.Ct. 693, 85 L.Ed. —, March 3, 1941, and of National Labor Relations Board v. National Motor Bearing Company, 9 Cir., 105 F.2d 652, and his application of the principles announced in these cases to the instant case. I withhold my approval of the main opinion as to these particulars only.

STEPHENS, Circuit Judge (specially concurring).

I am in agreement with the order provided for in the opinion prepared by Judge HANEY. I am in general agreement with the reasoning of the opinion, but find myself unable to voice a full approval thereof.

The opinion should, as I view the problem, avoid basing the application of the Wagner Act to the cause upon the finding that the labor trouble *could* reasonably affect commerce in the manner denounced by the act. The Board went further and

found as its judgment that such trouble *would* so affect commerce.

The statement in the opinion to the effect that the expressions of the Supreme Court in the case of National Labor Relations Board v. Express Publishing Company, 61 S.Ct. 693, 85 L.Ed. ——, March 3, 1941, leave the question therein treated as to cease and desist orders in doubt is not well taken. In my opinion the Express Publishing Company case is perfectly clear, and constitutes an affirmance of the principles laid down by this court in the case of National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 105 F.2d 652.

In this connection, I do not agree with the statement in Judge HANEY'S opinion in the instant case as to the holdings of this court in the Motor Bearing Company case.

In the latter case the facts as recited in our opinion show that there had been a violation by the respondent of each of the rights guaranteed employees in Section 7 of the Act, and that the Board had so found.

Section 7 reads, "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Section 8 makes it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 7.

The Board made its order requiring the respondent to cease and desist from "in any manner interfering with, restraining, or coercing its employees" in the exercise of the rights which the Board had found had been violated, referring to such rights in the terms of Section 7. The argument was advanced by the respondent that the Board had no power to order desistance from "in any manner" engaging in the unfair labor practice found, and that the only authority of the Board was to order desistance from the specific *act* by which the unfair labor practice was perpetrated.

This court by its majority opinion held that the argument of the respondent outlined above could not be supported, and that (105 F.2d page 660) "When the Board has made a finding, supported by substantial evidence, that an act has been done

which is prohibited as an unfair labor practice, the fair intent of the statute is that the Board is warranted in ordering desistance from such an unfair labor practice generally and is not required to limit its order so as to compel cessation only of the particular and limited activity found to have taken place."

Since, as I have pointed out above, the findings showed that the respondent had interfered with the employees in the exercise of each and every of the rights guaranteed them by Section 7, we held that the all encompassing cease and desist order was proper and should be enforced.

In the Express Company case, supra, the only unfair labor practice found was a refusal to bargain collectively with the representative of respondent's employees. The Board's order went further and ordered desistance from "in any manner" restraining, etc., its employees in the exercise of *any* of the rights guaranteed by Section 7. This the Supreme Court held was improper on the facts of the case. I quote from the opinion of the court, "We hold * * * that the National Labor Relations Act does not give the Board an authority, which courts cannot rightly exercise, to enjoin violations of all the provisions of the statute merely because the violation of one has been found. To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past. That justification is lacking here."

It should be noted, however, that the court modified the order so as to require only that the respondent shall cease and desist from *"In any manner* interfering with the efforts of the Guild to bargain collectively with Express Publishing Company, San Antonio, Texas". (Emphasis supplied.)

Thus it is clear that it was not the "in any manner" portion of the order of the Board which the Supreme Court held improper, but the fact that it was too broad under the facts of that case and ordered desistance from unfair labor practices that were not found to have been committed.

There is nothing in the Express Publishing Company case which is inconsistent with the holding in the National Motor Bearing Company case, and in fact the Express Publishing Company case is in effect

a complete affirmance of the decision we therein made, to-wit, that the cease and desist order was not necessarily to be directed against the commission of a specific act but instead could properly be directed against the violation of any right designated in Section 7 of which the specific act committed was evidentiary.